IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LYNX ASSOCIATES, INC.,          )
                                 )
          Plaintiff        )
                                 )
       v.                  )     Civil Action No. 02-cv-2741
                                 )
ASG CONSULTANTS LTD.,        )
                                 )
and                               )
                                 )
AMAR GREWAL and KAL GREWAL,  )
                                 )
          Defendants    )
                                 )
_____)

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants' motion for summary judgment, addressing all but one of the counts in plaintiff's Amended Complaint, raises a variety of issues, but at the core of defendants' motion is a misreading of the parties' Agreement. Throughout their motion, defendants mistakenly distinguish "termination without cause" from a decision not to renew the Agreement. The Agreement, however, defines "termination without cause" to be *one and the same thing as* not renewing the contract. The fact that defendants' decision not to renew the Agreement is defined as termination without cause, is the short response to much of defendants' argument.

**FACTUAL BACKGROUND**

Lynx is a sales agency specializing in the horticultural industry. It has spent many years and invested substantial amounts of time and money fostering strong business relationships with horticultural wholesalers and customers. ASG is a Canadian company that manufactures "Repellex," which protects gardens from deer. By Agreement dated August 1, 1998, Lynx and

ASG entered into a Sales Agency Agreement giving Lynx the right to be ASG's exclusive sales representative in twenty-two states in the eastern United States.  A copy of that Agreement is attached and made a  part hereof as Exhibit 1.  The term of that Agreement was to be for three years, and thereafter from year to year, unless it was either terminated for cause (Section 7.1 of the Agreement) or without cause (Section 7.2).

Specifically, the Agreement provides that:

> **7.  Term.**  This Agreement shall continue in force and effect for three (3) years and thereafter from year to year (not to exceed twenty-one (21) years unless renewed thereafter in writing by the parties) unless the first to occur of the following events, at which time the Agency's right to solicit new business shall terminate:

The Agreement then lists two, and only two, ways in which the Agreement can end before twenty-one years.  First, under section 7.1, it can be terminated "for cause." Second, under section 7.2, the Agreement can be terminated "without cause."  *See* Exhibit 1.

Termination for cause under the Agreement is controlled by section 7.1.2, which states:

> **7.1.2**  The election of one party (the "aggrieved party") to terminate this Agreement upon (1) the actual breach or actual default by the other party in the reasonable performance of the defaulting party's obligations and duties under this Agreement and (2) the failure of the defaulting party to cure the same within thirty (30) days (the "cure period") after receipt by the defaulting party of a good faith written notice from the aggrieved party specifying such breach or default and (3) provided that the defaulting party has not cured the default and the aggrieved party may then give written notice to defaulting party of his or its election to terminate fifteen (15) days after expiration of the cure period.

On the other hand, termination without cause is controlled by Section 7.2.1. The Agreement states, under the heading "Without Cause Termination,"  that Lynx's  right to solicit new business could terminate:

2

**7.2.1**  After the third (3) year, or on expiration of any one (1) year term thereafter, provided written notice of election to terminate is given in writing to the other party one-hundred twenty (120) days before expiration of the existing term.

On such termination without cause, the Agreement provides for the following payment to Lynx:

**6.2**  In the event of a "without cause termination" under paragraph 7.2 by the Principal, commissions shall continue to be earned by the Agency for a period of three (3) years following the termination of this Agreement.  The rate shall be at fifty percent (50%) of the amount the Agency earns pursuant to paragraph 6.1 of this agreement.

*See* Exhibit 1.

In April of 2001, defendant Amar Grewal, ASG's president, sent Lynx a letter, referring to paragraph 7.2.1 of the Agreement (that is, the clause allowing "without cause termination") and stating that he was giving the "written notice [that] must be given to the other party...."  He further stated that, "Please note my intention for doing this is to actually <u>continue</u> the association with Lynx Associates but under a new, revised sales rep agreement."  *See* Exhibit G to Defendants' Motion, also attached and made a part hereof for the Court's convenience as Exhibit 2 (emphasis is original).  While that letter did not actually suggest any revisions, on August 10, 2001, ASG proposed new terms to reduce Lynx's territory somewhat and also reduce the commission rate for some orders.  *See* Exhibit 3, attached and made a part hereof, a copy of that letter of August 10, 2001.

 The parties did not reach an agreement on this change.  Instead, on September 28, 2001, ASG's counsel wrote a letter to Lynx explicitly terminating the Agreement.  *See* Exhibit 4 attached and made a part hereof.  Unlike the notice letter sent in April of 2001, the termination letter sent in September stated that ASG had cause to terminate the Agreement.   However, Amar Grewal's letters of April 19 and August 10, 2001 (Exhibits 2 and  3), suggest that ASG's real

3

motive for termination appeared to be a desire to lower Lynx's commissions.

ASG had done nothing to fulfill the requirements of section 7.1.2, which sets forth the requirements for a termination "for cause."  ASG never sent a written notice specifying any breach or default of the Agreement.  ASG  never provided Lynx with thirty days after such notice to cure any alleged breach or default.  ASG never gave Lynx notice of its election to terminate after the expiration of a thirty days cure period.  In sum, ASG did not terminate Lynx "for cause" as provided in the Agreement.   Defendants have admitted as much. In its Response to Request for Admission 6, "ASG admit[ted], however, that its notification did not meet those technical guidelines established by Paragraph 7.1.2 of the Agreement."  Defendant's Response to Request for Admission 6, attached and made a part hereof as Exhibit 5.   In addition, in their "Second Affirmative Defense" in their answer to the amended complaint, defendants acknowledge that, "ASG did not terminate the Agreement ... 'for cause'...."

Defendants now have filed a motion for summary judgment which largely is an elaboration of that Second Affirmative Defense.  That affirmative defense states in full:

> ASG did not terminate the Agreement either "for cause" or "without cause."
> Prior to the end of the initial three-year term of the Agreement, ASG simply
> provided Plaintiff with notice that it would not renew the Agreement at the end of
> the initial three-year term and, therefore, the provisions of paragraph 6.2 relating
> to 'without cause termination' were never triggered.

That affirmative defense and this motion depend on the false proposition that there is a difference between "termination without cause" and a decision not to renew.  Under the Agreement, however, a decision not to renew is a "termination without cause."  In fact, it is the only sort of termination without cause allowed.

**<u>DISCUSSION</u>**

4

Defendants' motion for summary judgment asks the Court to ignore the parties' Agreement.   The Agreement sets forth only two ways in which the Agreement can be terminated, rather than automatically renewed for up to a total of twenty-one years.  The first is termination for cause.  However, reluctantly, defendants have now admitted that they did not follow the contractual procedures to terminate the Agreement for cause.[1]  The only other way to terminate the Agreement is without cause, which requires giving notice of an intent that the Agreement terminate at the end of the current term rather than automatically renew.   Of course, this is exactly what ASG did.  The only way to terminate the Agreement without cause is to notify the other party 120 days before the end of a term that it would not be renewed.   Yet defendants now insist that there is some other, third way to end the Agreement, one never mentioned in the Agreement, which they call "non-renewal."  There is no such third way, though.  "Non-renewal" is only another name for "termination without cause."[2]

**A.  <u>Count One– A Decision Not to Renew Is "Termination Without Cause"</u>**

The heart of defendant's argument, and the clearest statement of how that argument goes wrong, is found on pages 9 and 10 of Defendants' Memorandum:

> ...ASG did not terminate the Agreement "without cause."  The facts establish that ASG simply elected not to renew the Agreement at the conclusion of its initial term.  Thus, as a matter of law, ASG's action did not trigger paragraph 6.2.

---

[1]*See* plaintiff's motion for partial summary judgment.

[2]There are, of course, other claims in Lynx's Amended Complaint that turn on issues other than the meaning of "termination without cause," and these are addressed below as well.  At the outset, however, before addressing defendants' arguments, Lynx wishes to clarify the nature of the claims remaining in the case.  Lynx has chosen not to pursue its claims for tortious interference, the subject of Counts Four and Five.  Lynx also is not pursuing its claim under Count Eight for breach of the bonus commission Agreement.

The error in this claim is just this– "electing not to renew" is exactly what the Agreement means by "termination without cause."  It is electing not to renew that does trigger the obligation to pay commissions for three years, at half of the pre-termination rate, found in paragraph 6.2.

This dispute is grounded in section 7 of the Agreement, and an examination of what it says will clear up any confusion about what it means.  Section 7 states, in relevant part:

> **7.  Term.**  This Agreement shall continue in force and effect for three (3) years and thereafter from year to year (not to exceed twenty-one (21) years unless renewed thereafter in writing by the parties) unless the first to occur of the following events, at which time the Agency's right to solicit new business shall terminate:
>
> **7.1    For Cause Termination** [which defendants have admitted is inapplicable]
>
> **7.2    Without Cause Termination**
>
> **7.2.1**  After the third (3) year, or on expiration of any one (1) year term thereafter, provided written notice of election to terminate is given in writing to the other party one-hundred twenty (120) days before expiration of the existing term.

This is not really very complicated.  Under this Agreement, Lynx is entitled to represent ASG for twenty-one years, unless ASG properly terminates the Agreement.  ASG can terminate in two ways, and each has a very different consequence.  ASG can terminate for cause, and its obligations to Lynx cease.  This did not happen, as defendants have admitted. On the other hand, ASG can terminate without cause if it gives proper notice.  It can only do this at certain times, however.  ASG can terminate without cause at the end of an initial three-year period and thereafter at the end of one year periods.  If ASG did not want the Agreement to continue to automatically renew, it had to give notice that it wanted the Agreement to end 120 days before that automatic renewal took place.  This termination without cause is exactly what ASG claims it did in this case– that is, state that it did not want the Agreement to renew automatically at the

6

end of the initial three year term.

When ASG elects not to renew and terminates without cause, as it did here, it is only

obligated to pay as provided in paragraph 6.2 of the Agreement:

> 6.2  In the event of a "without cause termination" under paragraph 7.2 by
> the Principal, commission shall continue to be earned by the Agency for a period
> of three (3) years following the termination of this Agreement.  The rate shall be
> at fifty percent (50%) of the amount the Agency earns pursuant to paragraph 6.1
> of this agreement.

Where ASG breached the Agreement was when it refused to abide by its obligations

under Paragraph 6.2.

While defendants now argue that termination without cause is something different than

electing not to renew, ASG  understood that they are one and the same thing.  In their

memoradum, defendants acknowledge that

> Mr. Grewal stated in the April 19th letter that ASG was providing notice pursuant
> to paragraph 7.2.1 of the Agreement of its decision to "discontinue or terminate"
> the Agreement.  *While paragraph 7.2.1 relates to "without cause termination,"*
> Mr. Grewal's deposition testimony plainly demonstrates that his intent was to
> terminate the Agreement at the expiration of the initial term.

Defendants' Memorandum at 7 (emphasis supplied).  Mr. Grewal had it right in his letter of

April 19, 2001; "without cause termination" is the same thing as "terminating at the expiration of

the term."  Mr. Grewal did not want the Agreement to automatically renew at the end of the first

three year term, so he terminated the Agreement without cause.  If he had not given notice, he

and his company ASG would have been potentially liable for much greater damages for breach

of the Agreement.  Instead, ASG was only liable for what ASG is supposed to pay after "without

cause" termination– three years further commissions at only 50% of the pre-termination rate.

When Mr. Grewal and ASG went wrong was in refusing to abide by the obligations they

incurred after terminating the Agreement.   Paragraph 6.2 provides for the payment ASG is

obligated to make after terminating the Agreement rather than allowing it to automatically

renew.  Defendants have breached the Agreement by refusing to honor that obligation.

**B.  Count One– Paragraph 6.2 Is Not A Penalty Clause**

Paragraph 6.2 of the Agreement explicitly sets forth ASG's obligations to Lynx after

ASG chooses to terminate without cause.  Defendants contend, however, that paragraph 6.2 is an

unenforceable penalty because it is a disproportionate estimate of Lynx's damages for ASG's

breach.  In other words, they claim it is a liquidated damages provision, but an excessively harsh

one.  This argument fails for several reasons, but the first is that its initial premise is wrong.  A

liquidated damages provision exists to provide a measure of damages in the event of a party's

breach of the contract.  *River Road Associates v. Chesapeake Display and Packaging Co.,* 104

F.Supp.2d 418, 421 (D.N.J. 2000).  Paragraph 6.2 is not a liquidated damages provision at all,

however, and it is not concerned with a party's breach.  It simply provides for how Lynx was to

be compensated in the event ASG terminated the Agreement without cause.  It is a severance

package, not a liquidated damages clause.  Unfortunately, defendants have refused to pay that

severance.

As defendants cite in their Memorandum, it is the law in New Jersey that a stipulated

damages clause's validity is dependent on its "reasonableness."  *See* Defendant's Memorandum

at 12, citing *River Road Associates v. Chesapeake Display and Packaging Co.,* 104 F.Supp.2d

418 (D.N.J. 2000).  Presupposed in that assertion, of course, is the assertion that section 6.2 is a

"stipulated damages clause."  As the Court explained in *River Road Associates,* " a provision

that provides for the payment of specified damages *in the event of breach* is classified as a

stipulated damages clause." 104 F.Supp.2d at 421. In that case, the breach was on the part of a tenant under a commercial lease that failed to repair structural defects to the building it leased after the lease expired. The stipulated damages clause in that case came into play because of that breach. Here, by contrast, section 6.2 is not what ASG pays because it breaches, but what it agreed to pay in return for the right to terminate without cause.

Defendants' argument then makes a further, illogical leap, attacking paragraph 6.2 because it says the "damages it seeks to recover–lost commissions or profits– are capable of accurate estimate." Defendants' Memorandum at 12. It is very strange to suggest that a provision that requires someone to pay commissions (at 50% of the normal rate) should be set aside because those same commissions are capable of "accurate estimate." In fact, that non sequitur reveals why, even if paragraph 6.2 were about damages, it would not be a penalty. Penalties are arbitrary amounts not related to the actual damages suffered. Defendants admit that the damages in this case would be lost commissions. Paragraph 6.2 is not just an estimate of those lost commissions; it rather requires defendants to pay exactly those commissions, and nothing else.

Even if section 6.2 were a "stipulated damages" provision, it would be an eminently reasonable one. Section 6.2 provides a reasonable consideration in return for allowing defendants to terminate the contract without cause. As long as Lynx did not default on its obligations and provide justification for termination "for cause" (which did not happen), Lynx had a right to one of two possible alternatives. First, the Agreement would automatically renew for a total of twenty-one years, and Lynx would earn commissions for that entire twenty-one years. Second, ASG could terminate the Agreement (that is, choose not to renew it) by giving notice 120 days

before the automatic renewal.  In that case, Lynx would receive, as consideration for developing

a customer base for defendants as well as for the lost expectation of the remainder of the twenty-

one years, a severance package of three years' commissions, but at only half the rate to which it

previously was entitled.

### C.  Count Three– Defendants Fail to Address Their Acts of Bad Faith

Defendants also seek summary judgment on Count Three, which is grounded in the

implied covenant of good faith and fair dealing, on the basis that they did not breach the

Agreement in terminating Lynx without paying the commissions due under section 6.2.  That is,

since they claim there is no breach of contract under Count One, it follows there is no violation

of the covenant of good faith either.  Conversely, though, if there is a valid claim under Count

One, defendants' argument that there is no breach of the covenant of good faith for those same

actions must fail.

Defendants' argument completely ignores Count Two, which seeks damages for ASG's

selling its products in plaintiff's territory during the term of the Agreement but not paying

plaintiff any commissions for those sales.  Defendants also ignore the allegations in Count Three

that ASG failed to deliver products promptly.  In paragraph 40 and 41 of the Amended

Complaint, Lynx alleges:

> 40.  ASG persistently had backorder problems, thereby limiting the
> amount of the product that Lynx could sell.

> 41.  ASG failed to deliver Products in a prompt and reasonable manner,
> thereby limiting the amount of Products that Lynx could sell.

Defendants fail even to address these alleged acts of bad faith relating to defendants'

contractual dealings with Lynx.  In fact, defendants make no argument whatsoever that they are

entitled to summary judgment under Count Two, the count addressing ASG's failure to pay Lynx commissions on sales made in Lynx's exclusive territory.  The breaches of the implied covenant of good faith and fair dealing arise not only from terminating the Agreement without paying the commissions set forth in section 6.2 of that Agreement, but also from the failure to deliver products promptly and selling products in plaintiff's territory without paying plaintiff commissions on those sales.

### D.  Count Six --Lynx is a "Sales Representative" Under the New Jersey Statute

Defendants also seek to have the Court enter judgment against Lynx under the New Jersey Sales Representative Law because purportedly Lynx sold ASG's product, Repellex, to "ultimate consumers."   This argument is based on the definition of "sales representative" in the New Jersey Sales Representative Law, N.J.S.A. §2A:61A-1(c), which states:

> c. "Sales representative" means a person other than an employee, who contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission but shall not include one who places orders or purchases exclusively for his own account for resale and shall not include one who sells or takes orders for the sale of products to the ultimate consumer.

This argument misrepresents the testimony in this case, ignores defendants' own factual admissions, and misconstrues the applicable law.

In support of their contention that Lynx's customers for ASG's product "Repellex" were so-called "end users," defendants quote two small snippets of the deposition testimony of Lynx's president, Michael Kozak, and do so completely out of context.  The first bit of testimony they quote from Mr. Kozak's deposition is from a discussion of how to define "key account end users." *See* Defendants' Memorandum at 20.   This was a term Lynx used in its so-called "company profile," in effect, a sales brochure about Lynx itself, which it had provided to ASG as

part of its efforts to become ASG's sales representative.  *See* the portions of Mr. Kozak's

deposition attached and made a part hereof as Exhibit 6, at 30-36.  The context is important.  Mr.

Kozak's discussion of end users was not a discussion of who bought Repellex, but of the various

kinds of persons Lynx contacted on behalf of different manufacturers it represented.

Similarly, the only other quote from Mr. Kozak's deposition upon which defendants rely

refers to both distributors and end users, and the context was to define a term for defendant's

counsel:

> "Q.  Mr. Kozak, is there such a thing as Lynx customers?  Is that a term
> Lynx would use?
> A.  We could use, yes, the words, 'Lynx customers.'
> Q.  How would that phrase differ from your typical situation?  In other
> words, what is the difference between a Lynx customer and, say, a Kmart
> customer where I went to the desk and I purchased a Martha Stewart tablecloth,
> indictment and all?
> A.  The word is used rather loosely.  As we represent manufacturers, so
> we have contacts with people who we call on that we call customers. So therefore
> a homeowner, if they were to call us, they could be considered a customer
> because they're buying product from a garden center and then using the product.
> *But for the most part, customers would be considered distributors or end users."*

*See* Exhibit 6 at 178-179.  Only last, italicized sentence was quoted in Defendants'

Memorandum at 20.  Context, however, matters.  Mr. Kozak was not describing to whom he sold

Repellex in particular, but how the word "customer" is defined.  In other words, none of the little

bits of testimony actually support ASG's argument that Lynx is not a "sales representative"

because it sold Repellex to "ultimate consumers."

Defendants' characterization of the nature of Lynx's sales is belied by their own

documents which they have relied on as exhibits to their motion for summary judgment.  For

example, Exhibit "F" to that motion is a letter from Amar Grewal, ASG's principal, attached

hereto as Exhibit 7.  In that letter, Mr. Grewal complained that Lynx was not making enough of

an effort and spending enough time on three big accounts.  He describes these accounts as "distributors," when he wrote, "The top 3 Distributors for Repellex products on the East Coast are: Arett, Commerce and Country Fare."  Other accounts which placed orders for Repellex included Best Feeds ( "A lawn and garden center with several stores.  Or retail center I guess is the term we use," *see* Exhibit 6, Kozak deposition at 120-121).  In other words, the evidence is undisputed that Lynx sold "Repellex" to customers who were not "ultimate consumers."

Defendants have as yet produced no evidence that Lynx sold any "Repellex" to ultimate consumers.  Even if such evidence existed, however, the Court must be guided by the rule that "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as consonant to reason and good discretion." *Wamco XV Ltd. v. Farrell,* 693 A.2d 938, 941 (N.J. Super. 1997).  If some of Lynx's sales of Repellex were to end users (a factual assertion for which defendants have produced no evidence), certainly many of them were not.  A reasonable interpretation of the statute is that a sales representative who sells to distributors and is therefore protected by the New Jersey statute is not suddenly taken out of its protections altogether if it acquires a new customer who happens to be the ultimate consumer.  Rather, at most, for the purposes of that particular sale, the representative might no longer be a "sales representative" as defined by the statute.  It would still remain a sales representative under the statute for all its sales to distributors, retail centers and others who are not the ultimate consumers.  Moreover, the ultimate consumer of Repellex is the homeowner who wants to keep deer off of his or her property.  Plaintiff did not go door to door selling this product.  He went to distributors, to home and garden centers, and to other companies from whom homeowners purchase.  Plaintiff is a sales representative, exactly who the Act was meant to protect.

### E.  Count Seven – Lynx Is Protected By Other States' Statutes

Defendants also argue that Lynx is not protected by any of the other Sales Representatives Laws in the other states where it makes sales, but in so doing, they misrepresent the record.  For instance, they argue that Lynx is not protected by the New York statute because they claim "there is no evidence (or any allegation) that Lynx solicited orders in New York." Defendants' Memorandum at 23.  It is not only alleged, but defendants have admitted, that Lynx's territory included New York.  It is disingenuous, moreover, for defendants to claim that there is no evidence that sales were made in New York, since defendant ASG produced documents in discovery showing sales in New York!  *See, e.g.,*  Exhibit 8, attached and made a part hereof, copies of invoices ASG produced in discovery, marked ASG000090-94, showing sales to New York customers.

Defendants also claim that the Maryland and Minnesota statutes do not apply, for the same purported reason the New Jersey statute does not, because these statutes also do not protect those who sell to the "ultimate buyer."  Defendants' Memorandum at 23-25.  This argument fails for the same reasons that defendants' argument under New Jersey law fails.[3]

Defendants also argue that the Maryland statute does not apply because it defines a "sales representative" as a "person."  According to defendants, a "person" can only mean a natural person, not a corporation, despite over a century of American law concerning the personhood of corporations.  Defendants could find no support for that proposition in Maryland law, however,

---

[3]The New Hampshire Sales Representative Law, which defines a sales representative as an "individual," has been interpreted to exclude corporate sales representatives like Lynx.  *John A. Cookson Co. v. New Hampshire Ball Bearings*, 787 A.2d 858 (N.H. 2001).  Thus the New Hampshire act is not applicable to this action.

14

but rather cited a case from an intermediate court in Missouri interpreting that state's statute. *See* Defendants' Memorandum at 24 (citing *J.S. DeWeese Co. v Hughes-Treitler Mfg. Corp.*, 881 S.W.2d 638 (Mo.Ct.App. 1994). If defendants cite a Missouri case to suggest the right way to interpret Maryland's statute, it is only fair that it should have cited a more recent Wisconsin decision, *Industry to Industry, Inc. v. Hillsman Modular Molding, Inc.,* 644 N.W.2d 236 (Wis. 2002), in which the Wisconsin Supreme Court rejected the reasoning in *DeWeese,* and held that a corporation is a "person" under Wisconsin's Sales Representative Law. Similarly, defendants could have cited the decision in *M.S. Kind Associates, Inc. v. Mark Evan Products, Inc.,* 222 Ill.App.3d 448, 165 Ill.Dec. 1, 584 N.E.2d 180 (1991), in which the Illinois Court of Appeals decided that "persons" under Illinois' Sales Representative Law included corporations.

Even better than looking at other states' laws, one could actually look at Maryland law to interpret Maryland statutes. The word "person" is defined in a wide variety of Maryland statutes to include "corporations." For example, the Maryland Code, Labor and Employment §1-101, defines "Person" to mean "an individual, ...corporation...." This is the same section of the Code, the Labor and Employment chapters where the Sales Representative Law is found. *See* Maryland Code, Labor and Employment §3-601. Other places in Maryland statues where the term "person" is defined to include "corporation include Maryland Code, Business Regulation §1-101, Maryland Code, Commercial §1-101, Maryland Code, Commercial Law §12-501, Maryland Code, Commercial Law§14-301, Maryland Code, Commercial Law §14-401, Maryland Code, Commercial Law §14-1201, Maryland Code, Commercial Law §14-1901, Maryland Code, Financial Institutions §8-101, Maryland Code, Financial Institutions §12-802, Maryland Code, Natural Resources §3-101, Maryland Code, Natural Resources §3-904, and Maryland Code, Real

15

Estate §10-501.

In summary, defendants' attacks on the applicability of various states' Sales

Representatives Laws fail both because the facts are different than defendants claim and because

the law does not support them.

### F. Count Nine –Lynx Has Evidence Showing The Grewals Are ASG's Alter Egos

Finally, ASG once again seeks to attack the Count in which Lynx joined Amar and Kal

Grewal as defendants because they have acted as ASG's alter egos.  The evidence on which this

Count is based first arose in Amar Grewal's deposition as ASG's "corporate designee" under

Federal Rule of Civil Procedure 30(b)(6).  That testimony of corporate undercapitalization,

commingling of funds, and ignoring corporate formalities was detailed before this Court in

Lynx's memorandum of law supporting its motion to amend the complaint as well as its

subsequent reply memorandum in support of that motion.  That evidence alone is sufficient to

raise a colorable claim that the Grewals are ASG's alter egos, which is the import of this Court's

previous ruling allowing the amended complaint.

It is ironic that defendants would now seek summary judgment on that alter ego claim, in

essence arguing that Lynx's evidence is insufficient to pierce the corporate veil, when defendants

themselves have until recently refused to allow discovery on that topic.  Defendants recently have

agreed to produce documents pertaining to the topic of the Grewals' relationship with ASG, but

have not produced those documents yet.  Federal Rule of Civil Procedure 56(f) provides that

when it is clear that summary judgment is improper because of incomplete discovery, "the court

may refuse the application for judgment or may order a continuance to permit affidavits to be

obtained or depositions to be taken or discovery to be had or may make such other order as is

16

just." It would be premature to consider defendants' motion concerning the claim that the Grewals are ASG's alter egos before discovery on that topic is complete.

Even without further discovery, though, Amar Grewal's testimony alone raises a colorable claim that he and his wife are ASG's alter egos. As detailed in papers filed to support the motion to amend the complaint, Mr. Grewal testified that he was the sole director of ASG. *See* Exhibit 9, portions of Amar Grewal's deposition attached and made a part hereof, at 41. He also testified that both he and his wife take money from ASG's corporate funds as they wish for their personal use. *See* Exhibit 9, Amar Grewal's deposition at 40 - 41. Further, he testified that ASG does not own its facility. Rather, the Grewals do, and they lease it to the corporation. *Id.* at 38. The description of the business that Mr. Grewal gave indicates that it does not have a great deal of equipment or inventory on hand. Therefore, ASG does not have substantial capital assets. The Grewals' practice of taking corporate funds as they wish for their personal use could therefore strip ASG of assets quite quickly.

This is not the case of a few dollars taken from a multi-million dollar corporate account, but rather money taken at will from a small set of assets by the sole shareholder of the corporation and his wife. That is exactly the type of activity that renders the theory of corporate entity an empty sham. The Grewals using the corporate funds of a small, thinly capitalized corporation for personal use on a regular basis 1) is a "failure to observe corporate formalities," 2) is "siphoning the funds from the corporation by dominant shareholders," and (3) renders the corporation "a mere facade for the operations of a common shareholder or shareholders." *See Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 334 n.7 (3d Cir. 2000). Moreover, especially when the Grewals' behavior in taking corporate funds freely is considered, ASG may well be

undercapitalized, yet another factor to consider. *Eastern Minerals* at 334, n.7.   Mr. Grewal

testified that he can and does take money from the corporation at will.   That means nothing is

stopping Mr. Grewal from taking all of the money ASG owes to Lynx, so that ASG will be

rendered incapable of paying the judgment in this case.   In other words, due to the disregard of

corporate formalities, ASG will be insolvent.   *Id.*   Still other factors may be found to exist, such

as the absence of corporate records.

　　　　When there is only one shareholder in a corporation, the need for the corporate formalities

that the Grewals ignore to justify the corporate fiction is especially great.   For instance, in *St.*

*Hudson Engineers, Inc. v. Camden Hotel Development Associates,* 747 A.2d 931 (Pa. Super.

2000), the court held it was proper to find a corporation's sole shareholder and president to be

personally liable for the corporation's actions.   In turn, the corporation was the controlling partner

of a general partnership that breached its contract with an engineering firm.   The court found the

corporation was liable for the partnership's debt, and in turn the corporation's sole shareholder

was personally liable for that debt.   The Superior Court found that the trial court properly

"applied the alter ego theory of piercing the corporate veil, a theory which applies where the

individual or corporate owner controls the corporation to be pierced, and the controlling owner is

to be held liable." 747 A.2d at 935.   The entire body of  evidence of such alter ego status that the

court even mentioned was that

>　　　Malcolm Lazin is the sole shareholder, officer and employee.   In fact some
>　　　payments  made to Appellee for work performed pursuant to the subject contract
>　　　were tendered by personal checks, drawn on the personal account of Malcolm
>　　　Lazin.

*Id.* at 936.   Here, the Grewals own all the stock of ASG.   Just as Mr. Lazin ignored corporate

formalities and paid some of his corporation's contractual obligations, the Grewals ignored

corporate formalities to take their corporation's money, instead of paying the corporation's contractual obligations. Similarly, in *College Watercolor Group v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200 (1976), the Pennsylvania Supreme Court affirmed the decision to hold the sole shareholder personally liable for a judgment against his wholly owned corporation for selling watercolor reproductions that violated the plaintiff's trademarks and trade secrets. As the Supreme Court explained:

> It has been held that the corporate veil is properly pierced whenever one in control of a corporation uses that control or corporate assets to further one's own personal interests.

*Id.*, 360 A.2d at 207. In that case, the individual shareholder (Newbauer) threatened the plaintiff (also a corporation) that Newbauer's corporation would not pay its debts to plaintiff unless the plaintiff agreed to sell Newbauer stock in the plaintiff. "This fact alone support the conclusion that Newbauer did not keep his personal interests separate from the corporate interests." *Id. See also Commonwealth ex rel. Maier v. Maier*, 274 Pa.Super. 580, 418 A.2d 558 (1980) (where supporting spouse is sole stockholder of corporation and determines his own salary, court may pierce corporate veil and use corporate income as basis for determining earning capacity). Similarly, the Queen's Bench Court, describing the doctrine of piercing the corporate veil in Canadian law, has said it is appropriate to hold a sole shareholder liable for the contractual obligations of the corporation when the funds paid to the corporation "flowed through the corporation to the individual." *C-L Associates, Inc. v. Airside Equipment Sales, Inc.,* 2003 MBQB 104 (Manitoba Court of Queen's Bench, 2003) at ¶ 17, citing *Canadian Opera Co. v. 670800 Ontario, Inc.*, [1990] OJ No. 2270 (QL)(Gen.Div.). A copy of the *C-L Associates* decision is attached for the Court's convenience as Exhibit 10.

In other words, despite ASG's apparent suggestion that a host of factors must be established to allow the piercing of the corporate veil, when one is seeking to hold the sole shareholder of a corporation liable for the corporation's actions, a few critical facts can make all the difference.  As the Pennsylvania Supreme Court stated in *College Watercolor Group*, all it takes is showing that the sole shareholder used control of corporate assets to further his personal interests.  The Grewals use their total control of ASG's assets to supply their personal funds without regard to corporate formality.  This is more than enough to find the Grewals are ASG's alter egos.

## **CONCLUSION**

Defendants' motion for summary judgment depends largely on a set of misreadings of the parties' Agreement and of the record.  Not only should this Court deny defendants' motion, but it would be appropriate for the Court to grant plaintiff's own motion for partial summary judgment.

For all the reasons stated in this memorandum, plaintiff Lynx Associates, Inc. respectfully requests that the Court deny defendants' motion for summary judgment.

DATED: October 24, 2003                    Respectfully submitted,

                                           Kramer & Kramer, LLP


                                           By:_____
                                                Mitchell A. Kramer

Barbara H. Kramer
1077 Rydal Road, Suite 100
Rydal, PA 19046
(215) 887-9030

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I caused a copy of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion For Summary Judgment to be served on counsel for defendants by Fedex Overnight Delivery as follows:

21

Robert B. Bodzin, Esquire
Kleinbard, Bell & Becker LLP
1900 Market Street, Suite 700
Philadelphia, Pennsylvania 19103

Date: October 24, 2003

_____

Mitchell A. Kramer
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNX ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-cv-2741 |
| | ) | |
| ASG CONSULTANTS LTD., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMAR GREWAL and KAL GREWAL, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| _____ | ) | |

## **ORDER**

AND NOW, this ____ day of _____, 2003, upon consideration of defendants'

motion for summary judgment and all responses thereto, it is hereby ORDERED that the

motion is DENIED.

_____

J.