**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LYNX ASSOCIATES, INC., | |
| Plaintiff, | Civil Action No. 02-CV-2741 |
| v. | |
| ASG CONSULTANTS, LTD., et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT OR,
IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Defendants ASG Consultants, Ltd. ("ASG"), Amar Grewal and Kal Grewal file this

Memorandum of Law in support of their Motion for Summary Judgment or, in the Alternative,

for Partial Summary Judgment, on Counts One and Three through Nine of Plaintiff Lynx

Associates, Inc.'s ("Lynx") First Amended Complaint.

In 1998, ASG was a small, relatively new family business in the lawn and garden

industry specializing in the manufacture of repellant products.  ASG operated out of the home of

Amar and Kal Grewal, producing its line of products in the Grewal's garage.  Lynx, an

experienced sales representative in the lawn and garden industry, contacted ASG in 1998 and in

August of that year the parties entered into a contract entitled the Sales Agency Agreement (the

"Agreement").  The Agreement was drafted almost exclusively by Lynx and none of the relevant

portions of the Agreement were negotiated by ASG.  Pursuant to the Agreement, Lynx served as

a sales representative for ASG's Repellex line of products for a period of approximately three

years.

The present dispute arises out of the termination of the Agreement in August 2001. Lynx has turned a simple, run of the mill contractual dispute over a relatively limited amount of commissions alleged to be due at the time of termination into a wide ranging action asserting claims for breach of contract, tortious interference, and the violation of various state statutes. Lynx also seeks multiple, punitive and exemplary damages. In fact, when stripped of its hyperbole, Lynx clearly fails to meet the amount in controversy for federal diversity jurisdiction. As set forth below, there are no genuine, disputed issues of fact and Defendants are entitled to judgment as a matter of law on the overwhelming majority of these claims.

Summary judgment is warranted on Count One, which is premised on ASG's alleged breach of paragraph 6.2 of the Agreement, because there is no material issue of fact that ASG did not terminate the Agreement "without cause" and, therefore, its actions did not trigger the provisions of paragraph 6.2. Moreover, even if triggered, paragraph 6.2 is an unenforceable penalty clause. Similarly, Lynx fails to state a claim that ASG violated the implied covenant of good faith and fair dealing because ASG properly chose not to renew the Agreement. Therefore, ASG is entitled to summary judgment on Count Three.

Summary judgment is appropriate on Counts Four and Five, which assert claims for tortious interference, because Lynx cannot establish that ASG intentionally and improperly interfered with Lynx's business relationships with wholesalers, customers, and sub-agents. Specifically, these claims fail as a matter of law because: (i) Lynx did not have an existing or potential business relationship with either of the customers it has specifically identified as the subject of the alleged interference; (ii) there is no evidence of intentional and wrongful interference; (iii) Lynx is contending that ASG interfered with its own relationships, a legal

impossibility; and (iv) the alleged interference identified by Lynx, at best, amounts to nothing more than a breach of contract.

The Court should grant summary judgment on Count Six, Lynx's claim for violation of the New Jersey Sales Representatives' Rights Law, because Lynx does not come within the definition of "sales representative" under this statute. Summary judgment also is warranted on Count Seven, which asserts claims for alleged violations of the sales representative's laws of certain other, unidentified states, because; (i) as a matter of law these statutes are inapplicable to a sales representative operating out of New Jersey; (ii) even if sales representative's laws in other states were applicable, Lynx has not identified any violation of any particular states' law; and, (iii) Lynx does not come within the definition of a sales representative under the laws of four of the states that fall within the territory where it acted as ASG's sales representative.

ASG is entitled to summary judgment on Count Eight, Lynx's claim for breach of a purported "bonus agreement," because: (i) the alleged "bonus agreement" is prohibited by the specific terms of the Agreement requiring any modification of the Agreement to be in the form of a writing signed by all parties; and, (ii) the parties never reached a meeting of the minds with regard to the alleged "bonus agreement." Furthermore, if the Court grants summary judgment on Counts One and Three through Eight, the amount in controversy on the remaining claims in this action does not exceed $75,000.00 exclusive of interest and costs. Accordingly, the Court should dismiss the remainder of this action because it lacks subject matter jurisdiction.

Finally, if the Court does not dismiss the Amended Complaint, Defendants also are entitled to summary judgment on Count Nine. This count seeks to pierce the corporate veil to hold Amar and Kal Grewal personally liable for ASG's alleged improper conduct. Summary

judgment is warranted because, as a matter of law, the facts in this case do not support

disregarding ASG's corporate form.

## II.    FACTUAL BACKGROUND

### A.    The Parties

ASG is a small, family-owned company specializing in the manufacture of repellant

products that are designed to prevent animals from damaging plants.  See Transcript of the June

18, 2003 deposition of Amar Grewal ("Grewal Trans."), at p. 9, l.1-11 (attached hereto as

Exhibit A).  Specifically, ASG markets a seedling protection system under the trade name

Repellex (ASG's product line will hereinafter be referred to as "Repellex").  ASG is a Canadian

company that maintains its principal place of business in British Columbia, Canada.  ASG is

owned by Amar Grewal, who also is its sole director.  Id. at p. 51, l.13-14.  Other than Mr.

Grewal and his wife, Kal Grewal, ASG has only three employees -- a receptionist, an employee

who deals with production, and a part-time student employee.  Id. at p. 42, l.1-17.

Lynx is a sales agency engaged in the business of representing manufacturers and

distributors of products utilized in the horticultural industry.  Lynx was founded in 1992.  See

Transcript of the June 17, 2003 Deposition of Michael Kozak ("Kozak Trans."), at p. 9, l.14-16

(attached hereto as Exhibit B).  It is owned, in part, by Michael Kozak, who also serves as the

company's president.  Id. at p. 8, l.12-17.  Lynx is a New York corporation that maintains its

principal place of business in New Jersey.  See  Amended Complaint at p. 2, ¶6 (attached hereto

as Exhibit C).

### B.    Negotiation and Execution of The Agreement

In approximately February 1998, Lynx learned of Repellex after receiving an inquiry

about it from a customer.  See Kozak Trans. at p. 22, l.815.  Lynx then contacted ASG to find out

more about Repellex.  Id. at p. 27, l.14-p. 28, l.12.  Mr. Kozak spoke with Mr. Grewal about

Repellex and thereafter wrote to ASG expressing Lynx's interest in potentially becoming a sales representative for the company. <u>Id.</u> at p. 29, l.16-24. Prior to its discussions with Lynx, ASG had never entered into a contract with a sales representative to sell Repellex. <u>See</u> Grewal Trans. at p. 21, l. 13. Up until this time, ASG had marketed and sold Repellex on its own by advertising in trade magazines. <u>Id.</u> at p. 21, l.9-20.

Following Lynx's initial inquiry, the parties continued discussions concerning Lynx representing ASG as a sales representative. At the time, ASG was operating out of the Grewal's home and producing its line of products in their garage. <u>Id.</u> at p. 36, l.10-20. Lynx was aware that ASG was a small company being run out of the Grewal's home with very little staff. <u>See</u> Kozak Trans at p. 69, l.4-13.

On June 8, 1998, Lynx sent ASG a draft of its "Standard Representation Agreement". <u>See</u> June 3, 1996 Facsimile from M. Kozak to A. Grewal (Exhibit D). Lynx drafted this contract and had portions of it reviewed by counsel. <u>See</u> Kozak Trans. at p. 66, l.22-p. 67, l.16. Parts of Lynx's "Standard Representation Agreement" were based on an a standard agreement produced by the Manufacturers' Agents National Association ("MANA"). <u>Id.</u> at p. 68, l.13-16. After some negotiations, none of which related to the contractual provisions at issue, the parties executed the Agreement on September 1, 1998.[1] <u>See</u> Agreement (Exhibit E). The Agreement was drafted almost exclusively by Lynx.

The Agreement provided that Lynx would act as ASG's sales representative in a territory covering 22 states (the "Territory") for an initial term of three years. Unless terminated, the Agreement would automatically renew from year to year for a period not to exceed twenty-one

---

[1] The Agreement recites that its is made as of August 1, 1998 but it was not signed by the parties until September 1, 1998.

years.  <u>See</u> Exhibit E at p. 1, ¶1 and p.4, ¶7.  The Agreement also provided that it could be terminated "for cause" at any time or "without cause" after the initial three-year term:

> 7.2  Without Cause Termination
>
> 7.2.1  After the third (3) year, or on expiration of any one (1) year term thereafter, provided written notice of election to terminate is given in writing to the other party one-hundred twenty (120) days before expiration of the existing term.

<u>Id.</u> at p. 5, ¶7.2.  The Agreement further provided that ASG would have to continue paying Lynx commissions, at fifty percent of the Agreement rate, for a period of three years if ASG terminated the Agreement "without cause":

> In the event of a "without cause termination" under paragraph 7.2 by the Principal, commission shall continue to be earned by the Agency for a period of three (3) years following the termination of this Agreement.  The rate shall be at fifty percent (50%) of the amount the Agency earns pursuant to paragraph 6.1 of this agreement.

<u>Id.</u> at p. 4, ¶6.2.  This provision applied whether ASG terminated the Agreement after its initial term or after twenty years.  In stark contrast, Lynx was entitled to terminate the Agreement "without cause" without incurring any financial penalty.

**C.    <u>The Parties' Business Relationship</u>**

After executing the Agreement, Lynx began acting as ASG's sales representative in the Territory.  During the course of the initial term of the Agreement, problems began to develop with Lynx's representation of ASG.  In November 2000, Mr. Grewal wrote to Mr. Kozak to express ASG's dissatisfaction with Lynx's performance.  <u>See</u> November 14, 2000 letter from A. Grewal to M. Kozak (attached hereto as Exhibit F).  In this letter, Mr. Grewal provided Lynx with notice of Lynx's failure to perform its obligations and duties under the Agreement and an opportunity to cure these deficiencies.  <u>See</u> Grewal Trans. at p. 149, l.18-p. 152, l.24.  These deficiencies were not cured to ASG's satisfaction and, in April 2001, ASG gave Lynx notice that

it would not renew the Agreement after its initial three-year term expired.  See April 19, 2001

letter from A. Grewal to M. Kozak (attached hereto as Exhibit G).

     Mr. Grewal stated in the April 19th letter that ASG was providing notice pursuant to

paragraph 7.2.1of the Agreement of its decision to "discontinue or terminate" the Agreement.  Id.

While paragraph 7.2.1 relates to "without cause termination," Mr. Grewal's deposition testimony

plainly demonstrates that his intent was to terminate the Agreement at the expiration of the initial

term.  See Grewal Trans. at p. 136, l.9-22; p. 180, l.18-p. 181, l.1.  Although the April 19th letter

did not follow the precise guidelines for a "for cause" termination established by the Agreement,

it clearly indicates that ASG had elected to not allow the Agreement to renew after its initial

three-year term.  See Exhibit G ("Therefore, I am unable to have our current agreement

automatically renew itself.").

    **D.**    **The Present Litigation**

     The Agreement expired as of August 1, 2001 and Lynx ceased to represent ASG.  Lynx

filed its initial complaint against ASG in approximately May 2002.  After the parties conducted

discovery, Lynx sought leave to file the Amended Complaint, which the Court granted in July

2003.  The Amended Complaint added Amar and Kal Grewal as Defendants, alleging that they

are the "alter-ego" of ASG and that the corporate veil should be pierced to hold them personally

liable for all claims against ASG.  See Exhibit C at p. 12, ¶¶69-76.  Defendants now respectfully

move for: (i) summary judgment on Counts One and Three through Nine of the Amended

Complaint; and, (ii) if summary judgment is granted, dismissal of the remaining count of the

Amended Complaint for lack of subject matter jurisdiction.

## III.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). All reasonable inferences must be drawn in favor of the non-moving party. See La Fata v. Raytheon Co., 223 F. Supp. 2d 668, 678 (E.D. Pa. 2002).

If the non-moving party "bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." Id. (quoting Foulk v. Donjon Marine Co., Inc., 144 F.3d 252, 258 n.5 (3d Cir. 1998)). "[W]hen the record is such that it would not support a rational finding that an essential element of the nonmoving party's claim or defense exists, summary judgment must be entered for the moving party." Turner v. Schering-Plough Corp., 901 F.2d 335, 341 (3d Cir. 1990). [2]

As the following discussion will demonstrate, there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law on Counts One and Three through

---

[2] It is not clear what law should apply to the parties' dispute, as the Agreement does not contain a choice of law provision. Lynx is a New York corporation with its principal place of business in New Jersey. ASG is a Canadian company with its principal place of business in British Columbia, Canada. Amar and Kal Grewal are residents of Canada. A federal court sitting in diversity must apply the choice of law rules of the forum state. See Deere & Co. v. Reinhold, 2000 U.S. Dist. LEXIS 5276 at *14 (E.D. Pa. April 24, 2000) (Exhibit H). Pennsylvania's choice of law analysis combines the "significant relationship" test from the Restatement (Second) of Conflict of Laws and the "government interest analysis." Id. Without engaging in a detailed choice of law analysis, Defendants believe that it is likely that either New Jersey or Canadian law would apply to the parties' dispute. For purposes of this summary judgment motion, Defendants will assume that the law of New Jersey -- Lynx's principal place of business -- is applicable.

Nine.  Accordingly, the Court should grant summary judgment on these counts of the Amended Complaint.

**B.**     **<u>Summary Judgment Should be Granted on Count One of Lynx's Amended Complaint</u>**

Summary judgment is warranted on Count One of the Amended Complaint, which is a claim for breach of contract.  Lynx alleges that ASG breached the Agreement by terminating Lynx contrary to the terms of the Agreement and by failing to pay damages as required by the Agreement.  In this regard, Lynx is premising its breach of contract claim in Count One on paragraph 6.2 of the Agreement:

> In the event of a "without cause termination" under paragraph 7.2 by the Principal, commission shall continue to be earned by the Agency for a period of three (3) years following the termination of this Agreement.  The rate shall be at fifty percent (50%) of the amount the Agency earns pursuant to paragraph 6.1 of this agreement.

Exhibit E at p. 4, ¶6.2.  Summary judgment is appropriate for two reasons: (i) ASG did not breach any obligation to pay commissions pursuant to paragraph 6.2 because ASG did not terminate the Agreement "without cause" and, therefore, did not trigger the provisions of paragraph 6.2; and, (ii) ASG did not breach any obligation to pay commissions pursuant to paragraph 6.2 because paragraph 6.2 is an unenforceable penalty provision.[3]

**1.**     **<u>The Payment Provisions of Paragraph 6.2 of the Agreement Were Never Triggered Because ASG Did Not Terminate the Agreement Without Cause</u>**

Paragraph 6.2 expressly states that it only is applicable in the event of a "without cause" termination.  In this case, there is no genuine factual dispute that ASG did not terminate the Agreement "without cause."  The facts establish that ASG simply elected not to renew the

---

[3]  "The interpretation of a contract is a matter of law for the court."  <u>Atlantic City Racing Assoc. v. Sonic Financial Corp.</u>, 90 F. Supp.2d 497, 506 (D.N.J. 2000).

Agreement at the conclusion of its initial term. Thus, as a matter of law, ASG's actions did not trigger paragraph 6.2.[4]

The Agreement was for an initial period of three years. Thereafter, the Agreement provided that it would automatically renew from year to year for a period not to exceed twenty-one years. Id. at p. 4, ¶7. Notwithstanding the fact that Mr. Grewal referenced the notice provisions of paragraph 7.2.1. in his April 19th letter, while he actually intended to terminate the Agreement "for cause," this letter also provided effective notice that ASG simply was electing to not allow the Agreement to "automatically renew itself" after the initial term. See Exhibit G. The provisions of paragraph 6.2 were not triggered because ASG's non-renewal of the Agreement clearly was not a "without cause" termination necessary to invoke paragraph 6.2.

The very language of the "without cause" termination provision of the Agreement provides further support that ASG's action could not possibly have resulted in a "without cause" termination. Paragraph 7.2 of the Agreement states as follows:

> 7.2  Without Cause Termination
>
> 7.2.1  After the third (3) year, or on expiration of any one (1) year term thereafter, provided written notice of election to terminate is given in writing to the other party one-hundred twenty (120) days before expiration of the existing term.

Exhibit E at p. 5, ¶7.2. By providing that the Agreement could be terminated "without cause" only "*[a]fter the third (3) year,* or on expiration of any one (1) year term thereafter," paragraph

---

[4] ASG also maintains that it effectively terminated the Agreement "for cause" (see Grewal Trans. at p. 136, l.9-22; p. 180, l.18-p. 181, l.1) and that, consequently, paragraph 6.2 never became operable. ASG recognizes, however, that disputed issues of fact preclude summary judgment on the issue of whether it effectively terminated the Agreement "for cause." Nevertheless, summary judgment is appropriate on Count One because the Court need not reach this issue to grant ASG summary judgment. Setting aside whether ASG terminated the Agreement "for cause," the relevant facts also demonstrate that ASG simply elected not to renew the Agreement at the conclusion of its initial three-year term.

7.2 plainly precludes either party from terminating the Agreement without cause at any time during the initial three-year term of the Agreement.

If there is any ambiguity in paragraph 7.2.1, it should be construed against Lynx as the drafter of the Agreement. See SPM Corp. v. M/V Ming Moon, 965 F.2d 1297, 1302 (3d Cir. 1992) ("At the very least, the Blue Anchor bill of lading is an ambiguous form contract, and, as such, must be construed against its drafter, Blue Anchor."); Atlantic City Racing Assoc., 90 F. Supp.2d at 506 ("Where ambiguities appear in the contract, they are to be strictly construed against the drafter."). Paragraph 7.2.1 was part of the "Standard Representation Agreement" used by Lynx that it provided to ASG in June 1998. Lynx prepared this Agreement and had portions of it reviewed by counsel. See Kozak Trans. at p. 66, l.22-p. 67, l.16; see also Exhibit D. The language of paragraph 7.2.1 that appears in the final, signed version of the Agreement is unchanged from the original draft that Lynx provided to ASG. Compare Exhibit D with Exhibit E.

In short, Lynx's contention that ASG terminated the Agreement "without cause" during the third year of the Agreement, thereby triggering the payment provisions of paragraph 6.2, is untenable as a matter of law. ASG simply elected not to renew the Agreement after its initial three-year term. Whether ASG believed it was doing so on a "for cause" basis is immaterial. As a matter of law, ASG did not terminate the Agreement "without cause" (and under paragraph 7.2.1 could not during the initial three-year term of the Agreement) and, therefore, paragraph 6.2 is inapplicable.

## 2. **Paragraph 6.2 is an Unenforceable Penalty Provision**

Assuming, *arguendo*, that paragraph 6.2 was triggered by ASG's actions, ASG nonetheless is entitled to summary judgment because paragraph 6.2 constitutes a stipulated damages clause that is an unenforceable penalty provision.

New Jersey courts apply a reasonableness test to assessing the validity of a stipulated

damages clause:

> [T]he reasonableness determination hinges upon "whether the set
> amount 'is a reasonable forecast of just compensation for the harm
> that is caused by the breach' and whether the harm 'is incapable or
> very difficult of accurate estimate.'" . . . "[U]ncertainty or
> difficulty in assessing damages is best viewed not as an
> independent test, but rather as an element of assessing the
> reasonableness of a liquidated damages clause, . . . 'the greater the
> difficulty of estimating or proving damages, the more likely the
> stipulated damages will appear reasonable.'"

River Road Associates v. Chesapeke Display and Packaging Co., 104 F. Supp.2d 418, 423

(D.N.J. 2000) (citations omitted); see also Finkle v. Gulf & Western Manuf. Co., 744 F.2d 1015,

1021 (3d Cir. 1984) ("When the parties have made a reasonable forecast as to just compensation

for an injury that was difficult to estimate at the time they entered into the contract, that

provision will be deemed to be one for liquidated damages, and enforceable.  On the other hand,

a provision that calls for payment of a sum on non-performance or on default that is

disproportionate to the value of the performance promised or the injury that has actually occurred

will be deemed a penalty."); N.J.S.A. §12A:2-718.

Applying these factors to paragraph 6.2 leads to the conclusion that it is an unenforceable

penalty provision.  First, the type of damages it seeks to recover -- lost commissions or profits --

are capable of accurate estimate.  Based on Lynx's history of three years of performing under the

Agreement, it would not be difficult for Lynx to reasonably estimate its lost sales and the profits

it would have derived therefrom in the event of a breach of the Agreement.  The fact that

damages are not difficult to accurately estimate "necessitates a more narrow view of what

represents a reasonable forecast."  River Road Associates, 104 F. Supp.2d at 423.

Second, in light of the "narrow view" that is appropriate here, paragraph 6.2 is not a

reasonable forecast of just compensation.  Paragraph 6.2 bears no relation to any injury that Lynx

actually might suffer because it is tied to gross commissions. In this regard, the court's

observations in Wasserman's Inc. v. Township of Middletown, 645 A.2d 100 (N.J. 1994), are

instructive. In considering the reasonableness of a clause similar to paragraph 6.2, which

provided for payment of 25% of the lessee's average gross receipts for one year in the event that

the lessor cancelled the lease prior to the expiration of its thirty year term, the Wasserman's Inc.

court stated:

> Whether measured from the time of execution of the contract or
> from the termination of the lease, damages based on gross receipts
> run the risk of being found unreasonable. Generally speaking,
> gross receipts do not reflect actual losses incurred because of the
> cancellation. Gross receipts, unlike net profits, do not account for
> the ordinary expenses; nor do they account for the expenses
> specifically attributable to the breach. Here, we cannot determine
> whether the stipulated amount was based on damages that would
> likely flow from a breach or whether it is an arbitrary figure
> unrelated to any such damages.

Id. at 109. Paragraph 6.2's measurement of a payment for "without cause" termination based on

gross commissions presents identical problems. Moreover, paragraph 6.2 bears no relation to

any injury that Lynx actually might suffer because, as a result of being based upon future sales in

the Territory after the Agreement ends, it would allow Lynx to benefit from increased sales that

result from more diligent efforts by ASG or another sales representative to market Repellex in

the Territory.[5]

Paragraph 6.2 also is not a reasonable forecast of actual damages because it fails to

account for Lynx's duty to mitigate its damages. See Sommer v. Kridel, 378 A.2d 767, 771 n.3

(N.J. 1977) ("It is well established that a party claiming damages for breach of contract has a

duty to mitigate his loss."); see also River Road Associates, 104 F. Supp.2d at 424 ("This failure

---

[5]  In fact, Lynx potentially could earn more pursuant to paragraph 6.2 after the Agreement
terminated than it earned during the three years that the Agreement was in effect. In this sense,
paragraph 6.2 bears no relation to any actual damages that Lynx could incur.

to address the landlord's duty to mitigate renders the provision an unreasonable forecast of the harm anticipated in the event of a breach.").  Lynx's duty to mitigate its damages would require it to find another manufacturer it could represent to replace ASG or at least transfer the resources it previously utilized to market Repellex to the marketing of some other product line.  In either case, Lynx's losses, if any, would be limited by its ability to use resources formerly devoted to Repellex to earn profits selling other product lines.  Paragraph 6.2 allows Lynx to either:  (i) devote its resources and efforts to other products while still continuing to collect commissions on Repellex sales for three years; or, (ii) sit idly by and do nothing while still continuing to collect commissions on Repellex sales for three years.  In either case, Lynx would receive an unjust and unreasonable windfall.  See Spialter v. Testa, 392 A.2d 1265, 1270 (N.J. Super. 1978) (finding that clause in lease providing for payment of 25% of rent remaining due upon early termination was penalty and stating:  "The early termination clause, if enforced, would provide the landlord with a windfall by the receipt of full rental payment from the new tenant and an entitlement to an additional 25% of that rental payment from defendants.  While a landlord should not suffer financial loss where his tenant breaks a lease, neither is he entitled to profit thereby.").

Furthermore, paragraph 6.2 is not a reasonable forecast of damages because it provides for too long of a period to collect additional commissions.  The Agreement itself only was initially to last for thee years, yet paragraph 6.2 allows Lynx to collect commissions for another three years.  A provision that allows a sales representative to continue collecting commissions after a contract is terminated -- without performing any services -- for the same time period that a contract initially was in effect plainly is unreasonable.  Lynx simply would not continue to suffer damages for three years after the termination of its Agreement with ASG.

Finally, paragraph 6.2 is an enforceable penalty because it has an "in terrorem effect."

See River Road Associates, 104 F. Supp.2d at 424 ("Additionally, the Court finds the provision

unenforceable because it has an in terrorem effect.").  In River Road Associates, the court found

that a damages clause was unenforceable because of its "in terrorem effect," stating:

> In terrorem clauses are those that seek not just to compensate the
> injured party for its loss, but to deter breach by compelling
> performance.  Such a clause frustrates the underlying principles of
> contract law by effectively removing from the parties the option to
> breach and pay damages.

Id.; see also Wasserman's Inc., 645 A.2d at 108-09 ("[T]the purpose of a stipulated damages

clause is not to compel the promisor to perform, but to compensate the promise for non-

performance . . . .[a] clause is unreasonable if it does more than compensate plaintiffs for their

approximate actual damages caused by the breach.").  Paragraph 6.2 is an "in terrorem" clause

because it does more than set up a mechanism to compensate Lynx for actual loss -- it compels

performance.

Paragraph 6.2 is designed to deter ASG from terminating the Agreement for any reason

because, as happened in this case, Lynx would contend that such conduct triggered paragraph

6.2.  Thus, paragraph 6.2's purpose is to compel ASG to continually renew the Agreement for

successive one-year terms after the initial three-year term expires.

In sum, Defendants are entitled to summary judgment on Count One because paragraph

6.2 was never triggered and, even if triggered, it is an unenforceable penalty provision.

### C.    Summary Judgment Should be Granted on Count Three of Lynx's Amended Complaint

Count Three of the Amended Complaint alleges that "ASG's termination of the plaintiff

constituted a breach of the implied covenant of good faith and fair dealing."  See Exhibit C at p.

7-8, ¶39.  As discussed in section III(B)(1), supra, ASG properly elected not to allow the

Agreement to automatically renew. Therefore, the alleged "termination" of Lynx was consistent with the terms of the Agreement and, as a matter of law, could not constitute a breach of the implied covenant of good faith and fair dealing. Consequently, Defendants are entitled to summary judgment on Count Three.

> **D.** **Summary Judgment Should be Granted on Count Four of Lynx's Amended Complaint**

Defendants also are entitled to summary judgment on Lynx's claim for interference with its advantageous business relationships with wholesalers and customers. In its Amended Complaint, Lynx alleged that ASG interfered with its business relationships with wholesalers and customers "[b]y terminating plaintiff without cause and by contacting and selling Products directly to plaintiff's customers." See Exhibit C. During the deposition of its owner and president, however, the only act he identified as supporting this claim is ASG's alleged shipping of product to two customers in Lynx's territory, *during the last year the Agreement was in effect*, without listing these sales on Lynx's commission statements. See Kozak Trans. at p. 165, l.21-p. 166, l.21. Other than the facts set forth in Mr. Kozak's deposition, Lynx has put forth no evidence to support its tortious interference claim.

To establish a claim for interference with an existing or prospective business relationships, a party must satisfy the following elements:

> 1)    a plaintiff's existing or reasonable expectation of economic benefit or advantage;
>
> 2)    the defendant's knowledge of that expectancy;
>
> 3)    the defendant's wrongful, intentional interference with that expectancy;
>
> 4)    the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and,

       5)      damages resulting from the interference

Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir. 1993). In addition, "an element

of a tortious interference with a contractual or business relationship is malice, that is, the

'intentional doing of a wrongful act without justification or excuse.'" Monmouth Real Estate

Investment Trust v. Manville Foodland, Inc, 482 A.2d 186, 190 (N.J. Super. 1984).

      Applying the foregoing standard, Lynx's claim fails as matter of law for at least four

reasons. First, Mr. Kozak's testimony demonstrates that Lynx had no existing or potential

business relationship with the two customers that he identified, at least for the sale of Repellex,

because ASG directly dealt with these customers (or dealt with them through another sales

representative). Thus, the first necessary element of this tort is missing.

      Second, there is no evidence of any intentional and wrongful interference by ASG, even

if it is assumed, *arguendo*, that Lynx's allegation that ASG terminated it "without cause" is true.

ASG was justified in dealing with customers and wholesalers because under the Agreement,

ASG had the right to terminate Lynx without cause and continue doing business with customers

who purchased Repellex. ASG only dealt with these customers concerning Repellex, which

Lynx no longer had the right to sell. Lynx remained free to deal with these customers

concerning any other product lines it sold and there is absolutely no evidence that ASG

interfered with Lynx's ability to sell product lines other than Repellex to these customers. In

short, the record is devoid of any conduct that even approaches the malice standard applied under

New Jersey law. Consequently, the third requisite element of the tort is missing.

      Third, Lynx's claim for tortious interference is barred because Lynx is in essence

accusing ASG of interfering with its own business relationships. The Agreement itself

recognizes that the wholesalers and customers for whom Lynx served as ASG's representative

were ASG's customers: "Agent shall forward promptly to Principal any and all monies or

remittances in any form which Agency may collect or which may be placed in Agency's hands by *customers of Principal*." <u>See</u> E at p. 1, ¶3 (emphasis added).  In his deposition, Mr. Kozak also admitted that these customers were ASG's customers.  <u>See</u> Kozak Trans. At p. 179, l.10-18. It is well established that it is legally impossible for a party to interfere with its own contracts. <u>See</u> <u>East Penn Sanitation, Inc. v. Grinnell Haulers, Inc.</u>, 682 A.2d 1207, 1212 (N.J. Super. 1996) ("We conclude that the [defendant] was not subject to tort liability for its actions relating to the contract with plaintiff because a party cannot tortiously interfere with its own contract.").  This rule applies with equal force to a claim for interference with advantageous business relationships. Consequently, ASG cannot be liable for any alleged interference with the customers or wholesalers.

Fourth, ASG's alleged shipping of Repellex to customers in Lynx's territory without paying Lynx commissions (which Mr. Kozak claims took place while the Agreement was in effect) and its alleged improper termination of Lynx, even if proved by Lynx, amount to nothing more than breaches of contract.  As a matter of law, they cannot support a claim for tortious interference.  <u>See</u> <u>Rototherm Corp. v. Penn Linen & Uniform Service, Inc.</u>, 1997 U.S. Dist. LEXIS 10057 at *35 (E.D. Pa. July 3, 1997) ("If a breach of contract only incidentally affects the plaintiff's business relations with third parties, then the plaintiff's only cause of action lies in contract.") (Exhibit I); <u>see</u> <u>also</u> <u>Printing Mart-Morristown v. Sharp Electronics Corp.</u>, 563 A.2d 31, 38 (N.J. 1989) ("However, the rule of tortuous interference was not meant to upset the rules governing the contractual relationship itself.  Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law.").

Accordingly, Defendants are entitled to summary judgment on Count Four of the Amended Complaint.

### E.    **Summary Judgment Should be Granted on Count Five of Lynx's Amended Complaint**

Defendants are entitled to summary judgment on Lynx's claim for interference with its advantageous business relationships with its sub-agents as well.  This claim fails because Lynx cannot prove any actionable interference by ASG or that ASG acted without justification.

Mr. Kozak testified in his deposition that Lynx's claim for interference with its advantageous business relationships with its sub-agents is based on the fact that Andy Peterson of Spectrum Sales had conversations with ASG and allegedly was selling product for ASG.  See Kozak Trans. at p. 167, l.9-p. 168, l.2.  Mr. Peterson, however, approached ASG about continuing with ASG after its relationship with Lynx ended.  See Grewal Trans. at p. 76, l.10-24.  ASG did not know if Mr. Peterson had a contract with Lynx.  See Grewal Trans. at p. 80, l.5-11.  In addition, ASG specifically told Mr. Peterson that it "cannot, and will not, offer you a formal agreement until you obtain a written release from Mr. Kozak and Lynx Associates.  Without this, you are purely working on your own."  See March 25, 2002 letter from A. Grewal to A. Peterson (Exhibit J); see also Grewal Trans. at p. 74, l.1-18; p.

Based on these facts, there is no genuine dispute that Lynx has failed to establish that ASG interfered with its relationship with Mr. Peterson.  ASG only dealt with Mr. Peterson concerning Repellex, which Lynx no longer had the right to sell.  Lynx remained free to deal with Mr. Peterson concerning any other product lines it sold and there is absolutely no evidence that ASG interfered with Lynx's relationship with Mr. Peterson as it related to other product lines.  The conduct relied upon by Lynx plainly does not reach the level of intentional and wrongful conduct necessary to satisfy the malice standard applied in New Jersey.  Furthermore, ASG was justified in continuing to work with the same representative that previously sold its product, particularly where that representative approached ASG about continuing the

relationship.  Accordingly, Defendants are entitled to summary judgment on Count Five of the Amended Complaint.

**F.    Summary Judgment Should be Granted on Count Six of Lynx's Amended Complaint**

Defendants should be granted summary judgment on Count Six of the Amended Complaint, which asserts a claim under the New Jersey Sales Representatives' Rights Law, N.J.S.A. § 2A:61A-1, *et seq.*, because Lynx is not a "sales representative" as defined by this statute.  The New Jersey Sales Representatives' Rights Law expressly states that a "[s]ales representative . . . shall not include one who sells or takes orders for the sale of products to the ultimate consumer."  N.J.S.A. § 2A:61A-1(c).  Mr. Kozak testified in his deposition that the accounts ASG sold Repellex to included "end-users."  <u>See</u> Kozak Trans. at p. 36, l.15-p. 37, l.6 ("Q.  What are key accounts, key account end users?  A.  Larger-sized accounts.  Q.  Could you give me a few examples in ASG's case?  A.  The case of a key end user in the accounts that we have in our presentation here would be people like Newark Florist, Heinz Color.  On a retail --"); <u>see</u> <u>generally</u> Kozak Trans. at p. 179, l.7-9 ("But for the most part, customers would be considered distributors or end users.").

Mr. Kozak's testimony demonstrates that on some occasions Lynx sold or took orders for the sale of Repellex to the "ultimate consumer."  Therefore, as a matter of law, Lynx is excluded from the definition of a "sales representative" under the New Jersey Sales Representatives' Rights Law and Defendants are entitled to summary judgment on Count Six.

**G.    Summary Judgment Should be Granted on Count Seven of Lynx's Amended Complaint**

Count Seven asserts a general claim for alleged violations of the sales representative's laws of unidentified states.  Defendants are entitled to summary judgment on Count Seven of the Amended Complaint because:  (i) the laws of states other than New Jersey are inapplicable; (ii)

even if the sales representative's laws in other states in the Territory are applicable, Lynx fails to identify the commissions purportedly owed for sales in any particular state or ASG's violation of the applicable law in any specific state; and, (iii) Lynx does not come within the definition of "sales representative" under the relevant statutes in four of the states in the Territory that purportedly have sales representative's laws.

  **1.**    **The Sales Representative's Laws of States Other Than New Jersey Are Inapplicable**

  As a threshold matter, Lynx cannot avail itself of the protection of the sales representative's laws of states other than New Jersey. Lynx operated its business out of New Jersey and to the extent it seeks recovery under a state law covering sales representatives, it is limited to New Jersey law.[6] The mere fact that Lynx may have made sales to persons or entities in other states, while operating out of New Jersey, does not bring Lynx within the scope of these other states' laws. Lynx simply has no standing to assert claims under the sales representative's laws of these other states.

  **2.**    **Lynx Fails to Identify The Commissions Purportedly Owed For Sales in Any Particular State or a Violation of The Applicable Law in Any Specific State**

  Even if the sales representative's laws in other states in the Territory were applicable, Lynx has not identified the commissions purportedly owed for sales in any particular state or set forth ASG's alleged violation of the applicable law in any specific state. In fact, Count Seven does not even identify the applicable statute in any particular state.

  All that Count Seven does is identify twelve different states in the Territory that purportedly have sales representative laws providing for "exemplary damages, multiple damages, and/or liquidated damages plus counsel fees and costs" for the failure to pay commissions that

---

[6] As discussed above, Lynx is not covered by the New Jersey Sales Representatives' Rights Law because it is not a "sales representative" as defined by the statute. <u>See</u> <u>supra</u> § III(F).

are due.[7]  As a result of Lynx' failure to specifically allege that it is owed commissions in any particular state or that ASG violated any particular state's law, Count Seven should be dismissed because it fails even to state a claim upon which relief can be granted.

### 3.    Lynx Does Not Come Within The Definition of "Sales Representative" Under The Relevant Statutes in Four of The States in The Territory That Have Sales Representative's Laws

Finally, even if Lynx identifies particular violations of specific state laws, the relevant statutes in New Hampshire, New York, Maryland, and Minnesota do not apply under any circumstances because Lynx does not fall within the definition of a "sales representative" under these statutes.  Thus, to the extent that Count Seven is based upon the applicable laws in these states, Defendants are entitled to summary judgment.

### a.    New Hampshire

The applicable New Hampshire statute defines "sales representative" as "*an individual* other than an employee, who contracts with a principal to solicit orders and who is compensated, in whole or in part, by commission . . . ."  N.H.R.S. § 339-E:1 (emphasis added).  The New Hampshire Supreme Court has held that this definition, which specifically uses the term "individual," excludes corporations.  See John A. Cookson Co. v. New Hampshire Ball Bearings, 787 A.2d 858, 863-64 (N.H. 2001).  Lynx, as a corporation, is not a "sales representative" under the applicable New Hampshire law and, therefore, Defendants are entitled to judgment as a matter of law on Count Seven to the extent that Lynx is relying on New Hampshire law.

### b.    New York

The applicable New York statute defines "sales representative" as "a person or entity *who solicits orders in New York state* . . . ."  McKinney's Labor Law § 191-a (emphasis added).

---

[7]  The twelve states identified are:  New Hampshire, Massachusetts, New York, Pennsylvania, Maryland, Tennessee, Ohio, Indiana, Michigan, Wisconsin, Minnesota and Iowa.  Defendants' research has not uncovered an applicable sales representative's law in Iowa.

Lynx is not a "sales representative" under the applicable New York law because there is no evidence (or even any allegation) that Lynx solicited orders in New York. See McCoy Associates, Inc. v. Nulux, Inc., 218 F. Supp.2d 286, 292-93 (E.D.N.Y. 2002) ("Nulux next argues that McCoy Associates's claim under labor Law Sections 191-b and 191-c must be dismissed because there is no evidence suggesting that McCoy Associates 'solicit[ed] sales orders' in New York, and thus McCoy Associates was not a 'sales representative' under the Labor Law. . . . Nulux is correct, and thus McCoy Associates's second claim must be dismissed."). Therefore, Defendants are entitled to judgment as a matter of law on Count Seven to the extent that Lynx is relying on New York law.

###### c.    **Maryland**

The applicable Maryland statute defines "sales representative" as:

> [A] person who: (i) enters into a contract with a principal to solicit in the state a wholesale order; and (ii) is paid wholly or partly by commission. . . . . *'Sales representative' does not include a person who: . . . (ii) sells or takes an order for the sale of a product to an ultimate buyer*."

Annotated Code of Maryland, Labor and Employment, § 3-601(d) (emphasis added). A "principal" is defined as: "a sales corporation, partnership, proprietorship or other business entity that . . . ." Id. at (c).

Lynx is not a "sales representative" under the applicable Maryland law for two reasons. First, Mr. Kozak's testimony demonstrates that Lynx sold Repellex to "ultimate buyers." See Kozak Trans. at p. 36, l.15-p. 37, l.6 ("Q.  What are key accounts, key account end users? A. Larger-sized accounts. Q. Could you give me a few examples in ASG's case? A. The case of a key end user in the accounts that we have in our presentation here would be people like Newark Florist, Heinz Color. On a retail --"); see generally Kozak Trans. at p. 179, l.7-9 ("But for the most part, customers would be considered distributors or end users."). Second, the definition of

"sales representative" refers only to "person"; in contrast, the definition of "principal" refers to "a sales corporation, partnership, proprietorship or other business entity." <u>See</u> Annotated Code of Maryland, Labor and Employment, § 3-601(c) and (d). Under these circumstances, the definition of "sales representative" should be construed as encompassing only natural persons. <u>See</u> <u>J.S. DeWeese Co. v. Hughes-Treitler Mfg. Corp.</u>, 881 S.W.2d 638, 643 (Mo. Ct. App. 1994) (dismissing claim for violation of Missouri sales representative law and finding: "The definitional section of § 407.911, provides in pertinent part: '(2) Principal, a person, firm, corporation, partnership or other business entity, whether or not it has a permanent or fixed place of business in this state . . . (3) Sales representative, a person who contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission . . .' The text of the sales commission statutes do not specifically provide for the definition of 'person.' . . . The definitions provided in § 407.911 make it obvious that the sales commission sections are available only to sales representatives who are natural persons. Section 407.911 defines a 'principal' as a 'person, firm, corporation, partnership, or other business entity . . . which contracts with a sales representative paid in whole , or in part, by commission.' § 407.911 (2). It next defines a 'sales representative' as a 'person'. § 407.911 (3). As respondent suggests, the 'stark' contrast in the consecutive subsections of the statute reflect a clear legislative intent that the statute is available only to sales representatives who are natural persons and not corporations."). Consequently, Defendants are entitled to judgment as a matter of law on Count Seven to the extent that Lynx is relying on Maryland law.

     **d.**    <u>**Minnesota**</u>

     The applicable Minnesota statute defines "sales representative" to mean "a person who contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission. Sales representative does not include a person who: . . . (4) *distributes,*

*sells, or offers the goods, other than samples, to end users, not for resale*." M.S.A. § 325E.37(d) (emphasis added). As stated above, Mr. Kozak's testimony demonstrates that Lynx sold Repellex to "end users." <u>See</u> Kozak Trans. at p. 36, l.15-p. 37, l.6 ("Q. What are key accounts, key account end users? A. Larger-sized accounts. Q. Could you give me a few examples in ASG's case? A. The case of a key end user in the accounts that we have in our presentation here would be people like Newark Florist, Heinz Color. On a retail --"); <u>see generally</u> Kozak Trans. at p. 179, l.7-9 ("But for the most part, customers would be considered distributors or end users."). Accordingly, Lynx is not a "sales representative" as defined under Minnesota law and Defendants are entitled to judgment as a matter of law on Count Seven to the extent that Lynx is relying on Minnesota law.

### H.    Summary Judgment Should be Granted on Count Eight of Lynx's Amended Complaint

Count Eight of the Amended Complaint is predicated upon the alleged breach of a purported "bonus agreement," which Lynx claims is reflected in a September 26, 2000 facsimile from Mr. Grewal to Mr. Kozak. <u>See</u> September 26, 2000 facsimile from A. Grewal to M. Kozak (Exhibit K); <u>see also</u> Kozak Trans. at p. 156, l.17-22. Defendants are entitled to summary judgment on this count because: (i) the alleged "bonus agreement" is prohibited by the terms of the Agreement; and, (ii) the September 26th facsimile that allegedly constitutes the "bonus agreement" does not reflect a meeting of the parties' minds.

The "bonus agreement" clearly would amend and modify the compensation structure set forth in paragraphs 6 and 6.1 of the Agreement. <u>See</u> Exhibit E at 3, ¶¶6 and 6.1. Paragraph 8.1 of Agreement requires that any such amendment or modification of the Agreement be reflected in a writing signed by all parties:

> This Agreement may be modified or amended in whole or in part
> from time to time only by the mutual written agreement signed by

all parties and delivered by each one to the other prior to the
effective date of such modification or amendment

Exhibit E at p. 5, ¶8.1.

Lynx admits that it did not accept this alleged "bonus" offer in writing. <u>See</u> Kozak Trans. at p.148, l.18-p. 149, l.5. Lynx also admits that there is no written "bonus agreement" signed by the parties. <u>See</u> Kozak Trans. at p. 164, l.21-23. Not surprisingly, the September 26th facsimile, on which Lynx relies, is not signed by either party. <u>See</u> Exhibit K. Furthermore, Lynx never "delivered" the alleged "bonus agreement" to ASG prior to its effective date (whatever that date might be). Consequently, the Court should not even consider the substance of the September 26th facsimile. Pursuant to the terms of the Agreement, the parties as a matter of law never entered into a legally binding "bonus agreement" and Defendants are entitled to summary judgment.

Even if the Court considers the substance of the September 26th facsimile, Defendants still are entitled to summary judgment on Count Eight, because even a cursory review of this document demonstrates that it does not reflect a meeting of the parties' minds. <u>See</u> <u>MDC Investment Property v. Marando</u>, 44 F. Supp.2d 693, 699 (D.N.J. 1999) ("This lack of agreement on critical terms shows that the parties never had the requisite "meeting of the minds" to create an enforceable contract."). The September 26th facsimile bears the heading: "SUBJECT: PROPOSAL." The second sentence of this proposal states that ASG "would . . . like to make the following *recommendations*." <u>See</u> Exhibit K (emphasis added). On its face, this facsimile was nothing more than a proposal that made certain recommendations. The September 26th facsimile does not reflect ASG's agreement to any terms or conditions set forth therein and, as a result, does not reflect a meeting of the minds. Accordingly, as a matter of law, Defendants are entitled to judgment on Count Eight.

**I.    The Court Lacks Subject Matter Jurisdiction Over This Action if Summary Judgment is Granted on Counts One and Three Through Eight**

If the Court grants Defendants summary judgment as requested above, the remainder of this Amended Complaint should be dismissed because the amount in controversy does not exceed $75,000 exclusive of interest and costs and, therefore, the Court no longer possesses diversity jurisdiction over this action.

In the absence of Counts One and Three through Eight of the Amended Complaint, the only remaining substantive claim is Count Two. This is Lynx's claims for breach of contract for unpaid commissions on all accepted orders solicited within or delivered to the territory. According to Defendants' calculations, Lynx's claim for commissions due and owing as of non-renewal of the Agreement is approximately $10,000.00 in total. See September 28, 2001 letter from Martin Sandel to M. Kozak (Exhibit L). Even if ASG's calculations are subject to some minor revisions, this amount plainly will not satisfy the amount controversy requirement of $75,000.00. See 28 U.S.C.A. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between - (1) citizens of different states . . . ."). Therefore, the Court should dismiss this case for lack of subject matter jurisdiction. See F.R.C.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

**J.    Summary Judgment Should be Granted on Count Nine of Lynx's Complaint**

Finally, if the Court does not dismiss the remainder of the Amended Complaint, Defendants are entitled to summary judgment on Count Nine. In Count Nine Lynx seeks to hold Amar and Kal Grewal personally liable for the alleged misconduct of ASG by "piercing the

corporate veil."  The facts as adduced during discovery, however, simply do not support piercing

the corporate veil to hold either Amar or Kal Grewal personally liable.

A court should disregard the corporate form and pierce the corporate veil only where a

corporation's separate existence is a subterfuge.  In Eastern Minerals & Chemicals Co. v. Mahan,

225 F.3d 330 (3d Cir. 2000), for example, the Third Circuit observed:

> We have commented that "Pennsylvania, like New Jersey, does not
> allow recovery unless the party seeking to pierce the corporate veil
> on an alter ego theory establishes that the controlling corporation
> wholly ignored the separate status of the controlled corporation
> and so dominated and controlled its affairs that its separate
> existence was a mere sham. . . .  In other words, both Pennsylvania
> and New Jersey require a threshold showing that the controlled
> corporation acted robot- or puppet-like in mechanical response to
> the controller's tugs on its strings or pressure on its buttons."

Id. at 334, n.6 (quoting Culbreth v. Amosa (Pty) Ltd., 898 F.2d 13, 14-15 (3d Cir. 1990) (per

curiam)); see also Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994)

("[G]enerally a shareholder is not personally liable to perform corporate obligations.  The

corporate veil is pierced only when the corporation was an artifice and a sham to execute

illegitimate purposes and an abuse of the corporate fiction and immunity that it carries.")

(citations omitted); Catsouphes v. Atex Associates, Inc., 671 A.2d 208, 210 (N.J. Super. 1996)

("'We begin with the fundamental propositions that a corporation is a separate entity from its

shareholders, . . . and that a primary reason for incorporation is the insulation of shareholders

from the liabilities of the corporate enterprise.'  . . .  However, in limited cases such as 'fraud,

injustice, or the like,' courts may pierce the corporate veil to impose liability upon shareholders.

. . . The justification for imposing personal liability upon a shareholder 'is to prevent an

independent corporation from being used to defeat the ends of justice, . . . to perpetrate fraud, to

accomplish a crime, or otherwise to evade the law, . . . .'") (citations omitted).

The Third Circuit's decision in <u>First Options</u> is instructive in the present case.  In <u>First Options</u> the plaintiff attempted to pierce the corporate veil against the president of the defendant corporation, who had, on occasion, withdrawn funds for personal use without observing corporate formalities.  The Third Circuit declined, however, to pierce the veil because "none of these withdrawals appear to have affected MKI's solvency or to have been made when it was insolvent. This record does not clearly and convincingly show that MKI was a sham Mr. Kaplan manipulated in fraud of its creditors."  <u>First Options</u>, 19 F.3d at 1523.  In reaching this decision, the court noted:

> Not every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil.  The remedy is available only if it is also shown that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors.  In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used to corporation for illegitimate purposes.

<u>First Options</u>, 19 F.3d at 1522; <u>see also</u> <u>Mahan</u>, 225 F.3d at 334 n.7 (outlining factors to consider under Pennsylvania law for piercing the corporate veil based on an alleged "alter ego" theory, which include: "The failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere façade for the operations of a common shareholder or shareholders; and gross undercapitalization.").

Under the standard set forth above, the facts relied upon by Lynx do not support piercing the corporate veil to hold Amar or Kal Grewal personally liable.  First, there is no evidence to support piercing the corporate veil to hold Kal Grewal personally liable.  Second, Lynx contends that it should be permitted to pierce the corporate veil to hold Amar Grewal personally liable

because: (i) Mr. Grewal is the sole director and shareholder of ASG (see Grewal Trans. at p. 51. l.10-14); (ii) Mr. Grewal takes draws from ASG in lieu of a salary (id. at p.39, l.22-p. 40, l.4; p. 41, l.20-24); and, (iii) Mr. Grewal and his wife own one of the warehouse facilities out of which ASG presently operates, which they lease to ASG (id. at p.36, l.21-p. 39, l.8).  These facts simply do not demonstrate that Mr. Grewal operates ASG as a an artifice and a sham, to further his own illegitimate purposes and perpetrate fraud.  As a matter of law, they fall woefully short of satisfying the stringent standard that applies to piercing the corporate veil to hold an individual shareholder liable for corporate liabilities.

In sum, under the facts of this case, there can be no genuine dispute that there is no basis to pierce the corporate veil and hold either Amar or Kal Grewal personally liable for any alleged improper conduct by ASG.  Accordingly, they are entitled to summary judgment on Count Nine.

## IV.    CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant them summary judgment on Counts One and Three through Nine of Lynx's Amended Complaint.  In addition, if the Court grants summary judgment, Defendants respectfully request that the Court dismiss the remainder on Lynx's Amended Complaint for lack of subject matter jurisdiction.

Respectfully submitted,

KLEINBARD, BELL & BRECKER LLP

_____
ROBERT B. BODZIN, ESQUIRE
ERIC J. SCHREINER, ESQUIRE
1900 Market Street, Suite 700
Philadelphia, PA  19103
(215) 568-2000

Dated:  October 13, 2003