IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNX ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-cv-2741 |
| | ) | |
| ASG CONSULTANTS LTD., | ) | |
| AMAR GREWAL and KAL | ) | |
| GREWAL, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

Plaintiff, Lynx Associates, Inc., respectfully moves this Court for leave to file a second amended complaint pursuant to Federal Rule of Civil Procedure 15 and to bring claims against Natura Products, Inc. as the alter ego or continuation of ASG Consultants Ltd., and to allege fraudulent conveyances from ASG Consultants Ltd. to Natura Products, Inc., all as described more fully in the accompanying Memorandum of Law.  A true and correct copy of the proposed Second Amended Complaint is attached hereto and made part hereof as Exhibit A.

Respectfully submitted,

KRAMER & KRAMER, LLP

Dated: _____          BY: _____
                                                                Mitchell A. Kramer
                                                                1077 Rydal Road, Suite 100
                                                                Rydal, PA   19046
                                                                (215) 887-9030

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LYNX ASSOCIATES, INC.,              )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        Civil Action No. 02-cv-2741
                                    )
ASG CONSULTANTS LTD.,               )
AMAR GREWAL and KAL                 )
GREWAL,                             )
                Defendants.         )

## **ORDER**

AND NOW, this    day of      , 2004, upon consideration of plaintiff, Lynx Associates, Inc.'s Motion for Leave to Amend the Complaint and all responses thereto, it is hereby ORDERED that the Motion is GRANTED, and plaintiff is granted leave to file and serve the Second Amended Complaint in the same form as the proposed Second Amended Complaint attached as Exhibit A to plaintiff's Motion.

BY THE COURT:

_____
                                    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LYNX ASSOCIATES, INC.,                    )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )        Civil Action No. 02-cv-2741
                                          )
ASG CONSULTANTS LTD.,                     )
AMAR GREWAL and KAL                       )
GREWAL,                                   )
              Defendants.                 )

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

Quite recently, defendants, pursuant to the Court's order, produced a number of documents that show that ASG Consultants Ltd. ("ASG") is intermingling its assets and business with another, closely related corporation, Natura Products Inc. ("Natura").[1]  Based on this information, plaintiff, Lynx Associates, Inc. ("Lynx"), seeks leave to amend its complaint in order to add Natura as a defendant on theories of piercing the corporate veil, successor liability, and fraudulent conveyance.

### I.    UNDISPUTED FACTS

**Relationship between Lynx and ASG**

Lynx is a sales agency specializing in the horticultural industry with its principal place of business in New Jersey.  Lynx has spent many years and invested substantial amounts of time and money fostering strong business relationships with horticultural wholesalers and customers.  ASG is a Canadian company that manufactures "Repellex," which protects gardens from deer, and a related products such as mosquito and tick repellant.   On August 1, 1998, Lynx and ASG

---

[1]Plaintiff's counsel received the first of these documents on December 16, 2003; a few more on January 4, 2004, but received  the largest number of them on February 2, 2004.

entered into a Sales Agency Agreement in which Lynx agreed to be ASG's exclusive sales representative in twenty-two states in the eastern United States. The term of that Agreement was to run for three years, and thereafter run from year to year, unless it was terminated either for cause (Section 7.1 of the Agreement) or without cause (Section 7.2). If terminated without cause, Lynx was entitled to receive commissions for three years following the termination. *See* Exhibit 1, August 1, 1998 Agreement. All the numbered exhibits are attached to the accompanying Appendix and are described on the Appendix's cover index.

Even though Lynx increased ASG's sales, in August 2001 ASG terminated Lynx, shortly after the first one year renewal term began. Lynx argues that it is therefore entitled to receive commissions for three years after that date, and the "rate shall be at fifty percent (50%) of the amount the Agency would have earned pursuant to paragraph 6.1 of this agreement." Exhibit 1 at 6.2.[2] ASG also failed to pay Lynx commissions Lynx had earned before the date of termination.

### The Grewals as ASG's alter egos

Amar Grewal is ASG's president and sole shareholder. In June 2003, he testified that his salary formerly was determined "by draws, depending on the necessity of what I require." Exhibit 2, deposition of Amar Grewal at p. 39-40. In other words, he "drew up from the company that which [he] needed to live." Exhibit 2, Grewal depo. at p. 40. Mr. Grewal further explained that although he now has a set salary, he continues to draw additional money for living expenses. *See* Exhibit 2, Grewal depo. at p. 41. His wife, Kal Grewal, is an employee of ASG.

---

[2]Lynx and defendants have filed cross-motions for summary judgment on the issue of the proper interpretation of their Agreement, specifically paragraphs 6.1, 7.1 and 7.2.

Amar Grewal testified that formerly his wife did not take a salary but was "just taking draws necessary to ... live on." Exhibit 2, Grewal depo. at p. 40-41. As of June 2000, however, she had an employment contract in which ASG had agreed to pay her $15.00 an hour for her services as office manager, with no benefits, but ASG has advanced her substantially more than that wage rate would justify.

The intermingling of ASG's corporate assets and the Grewals' personal assets is detailed more fully in plaintiff's motion for partial summary judgment against the individual defendants. The documents defendants produced pursuant to the Court's order that show that the Grewals are ASG's alter egos also show that ASG's funds are being siphoned off into another corporation in which Amar Grewal is a major shareholder, Natura Products, Inc.

### ASG's intermingling of assets with Natura Products, Inc.

Natura maintains an address at the same location as ASG, and manufactures and sells very similar products to those of ASG. *See* Exhibit 3, a printout of the pages of Natura Products, Inc.'s website, "http://www.naturaproducts.ca." As Amar and Kal Grewal own the facility that ASG and Natura share, they are not only ASG's landlords but Natura's as well. *See* Exhibit 2, Amar Grewal's depo at p. 38. Amar Grewal is the sole shareholder in ASG and holds a fifty percent share in Natura. The other shareholder is a man named Thandi. See Exhibit 4, the declaration of Michael Kozak.

ASG lists an advance to a "related company" of $11,175.00 on its balance sheet for the year ended January 31, 2002. *See* Exhibit 5, ASG's Statement of Income and Deficit for the year ended January 31, 2002. That same year, ASG claimed a net loss of $46,526.00 on its balance sheet and also its corporate tax return. *See* Exhibit 6, ASG's corporate tax return for the year

5

ended January 31, 2002.

As noted above, ASG terminated Lynx without cause in August 2001. Lynx brought this action in May 2002, seeking the commissions ASG owed to it before the termination (at least $11,000.00) as well as damages as provided in the contract equal to three years' commissions (at half the contractual rate) on all sales into Lynx's former territory. In addition, Lynx sought, pursuant to statutes protecting commissioned sales representatives, multiple damages and attorneys' fees. After May 2001, ASG began paying Natura's operating expenses, *see* Exhibits 9 through 12 and 14 through 22, invoices, checks et al., and on January 31, 2003, it advanced Natura $153,854.75. Therefore, when ASG transferred its funds to Natura and paid Natura's operating expenses, it was aware of Lynx's claims.

In the year ended January 31, 2003, ASG advanced Natura $168,090.00. *See* Exhibit 7, ASG's Statement of Income and Deficit for the year ended January 31, 2003. ASG has produced copies of an "Account QuickReport" for that same year detailing ASG's transfers to Natura, showing total transfers of $168,090.29. In all, ASG's "Account QuickReport" lists six transfers of funds to Natura Products, Inc., over the course of that year. At the beginning of the year, it transferred $11,174.83 to Natura Products, Inc. and at the end of that year it transferred an additional $153,854.75. In between, it made four payments to Natura to cover the expenses of trade shows. *See* Exhibit 8, ASG's "Account QuickReport" as of January 31, 2003.

The transfers of funds to Natura that ASG listed on these "Account QuickReports" do not even include all the payments ASG made that same year to Natura's suppliers for castor oil, packaging materials, display stands, labels, marketing materials and the like. At trade shows, Natura and ASG shared a booth where both Natura's products and ASG's products, all of which

6

are essentially some sort of chemical repellant (deer repellant, mosquito and tick repellant), are

displayed.  ASG paid for these trade shows and the display materials used there.  Natura and

ASG buy production supplies and marketing materials from the same suppliers and are often

invoiced jointly, while ASG pays the bills for both companies.  *See* Exhibits 9 through 22,

invoices, checks, et al., which are ASG's own documents showing the intermingling of ASG and

Natura's business operations and ASG's subsidy of Natura's business operations.  These are

described individually on the cover index to the Appendix.

ASG's transfer of funds to Natura, and its payment of Natura's business expenses, caused

ASG to spend close to $200,000.00 on Natura's behalf in the fiscal year 2002, immediately after

ASG declared a loss on its tax return.  Now, ASG is again claiming financial difficulty, stating

that it is unable to pay its legal costs.  *See* Exhibit 23, a letter dated January 7, 2004 from

defendants' counsel to plaintiff's counsel; *see also* defendants' counsel's motion for leave to

withdraw.

## II.    <u>DISCUSSION</u>

Federal Rule of Civil Procedure 15(a) states that leave to amend "shall be freely given

when justice so requires."  In this matter, justice would be served by allowing amendment, as the

facts recently uncovered suggest that ASG has transferred funds to a closely related corporation,

Natura Products, Inc. ("Natura"), and that these transfers might be fraudulent conveyances, that

Natura and ASG are alter egos and/or Natura is a "mere continuation" of ASG.  Therefore,

Natura should be held liable for ASG's debts and liabilities.  Not allowing Lynx to reach Natura

could expose it to the very real possibility that it will obtain a judgment against ASG, but that

ASG will not have sufficient assets to pay that judgment because those assets had been shifted to

Natura.

As this Court stated a few years ago, courts should grant requests to amend liberally, and deny them only where there has been undue delay, bad faith, or where it would be prejudicial to the nonmoving party. *Phoenix Technologies, Inc. v. TRW, Inc*., 154 F.R.D. 122 (E.D.Pa.1994) affirmed 43 F.3d 1462(3d Cir. 1994). Here, there has been no undue delay or bad faith. The evidence justifying, and indeed mandating, this amendment, only was produced in recent weeks. Lynx only learned of Natura's existence at the end of December 2003, and has since engaged in research into Natura and ASG's relationships needed to ensure that the following claims against Natura are indeed justified. On the other hand, there will be no unfair prejudice either to ASG or to Natura. Natura shares common ownership, management and other personnel, and location with ASG, and cannot be unaware of this dispute.

The addition of new parties, when these parties are closely related to one already in the case and when they clearly have notice of the pending claims, should give this Court no pause. For example, Judge Pollak, in *Taliferro v. Costello,* 467 F.Supp.33 (E.D.Pa.1979), allowed a civil rights plaintiff to amend his complaint, originally brought against a Philadelphia deputy sheriff for allegedly trespassing on his property and using illegal force on him in attempt to serve papers on him, to amend his complaint to join the city of Philadelphia as well, and allowed that amendment even though it was brought well after the passage of the original statute of limitations period. Judge Pollak relied on the rule that amendments should be liberally granted and a factor very much present here, that the newly named defendants always knew of the lawsuit in question. Natura's two shareholders include Amar Grewal, already a defendant here, and a Mr. Thandi, who has told Lynx's president, Michael Kozak, in a personal meeting that he

8

knew about ASG and Lynx's dispute.  *See* Exhibit 4, Kozak declaration.

There are three theories of liability supported by the recently produced documents.  First, Natura is ASG's corporate alter ego, being used by ASG's individual alter egos, Amar and Kal Grewal, to siphon off ASG's funds and provide them with a new, less-encumbered business vehicle.  Second, Natura is a "mere continuation" of ASG.  Finally, ASG's transfers of money to Natura constitute fraudulent conveyances and can be set aside.

### A.    Natura Is ASG's Alter Ego

Just as it is sometimes appropriate to pierce the corporate veil to reach the individual shareholders (for example, finding Amar and Kal Grewal responsible for ASG's debts and liabilities), it is sometimes appropriate to pierce the corporate veil to hold a related corporation liable as well.  The evidence mandates that ASG's corporate veil should be pierced to reach not only the Grewals but Natura, which appears to be the Grewals' new business vehicle.  In *Stochastic Decisions, Inc. v. DiDomenico*, 565 A.2d 1133 (N.J.Super. 1989), the court explained when one corporation can be held liable for the debts of another.  There, it was appropriate to hold a group of closely held corporations jointly and severally liable for the bad checks one of them had issued to an insurance broker.  All of the corporations had identical owners, there was a commingling of assets between the corporations, and the corporations operated in each other's names.  *Id.* at 1135-1136.  The court, while noting the more typical situation in which the corporate veil is pierced is between parents and subsidiaries, said that

> given the ease with which the individual owners here altered their organizations and closely held assets, there appears to be no reason to limit the application of the rule to parent-subsidiary relationships.

*Id.* at 1136.  The same situation exists between ASG and Natura.  Both are closely held, with Amar Grewal holding 50% of Natura and all of ASG's shares.  ASG has transferred substantial funds to Natura, pays for Natura's appearances at trade shows and shares a booth at those trade shows with Natura.  Similarly, in *Platinum Management, Inc. v. Dahms,* 666 A.2d 1028 (N.J.Super. 1995), the New Jersey Superior Court found that two sister corporations, GAF Hong Kong and GAF Ohio, were in effect each other's alter ego.  The two corporations, GAF Hong Kong and GAF Ohio, had mutual ownership.  They used common agents, common sales representatives, and had common products and customers.  The same sales representatives provided sales support for both GAF Hong Kong and GAF Ohio. "Therefore, it is entirely appropriate to consider GAF Hong Kong to be the *alter ego* of GAF Ohio and to pierce the corporate veils of both entities for a just and equitable result." *Id.* at 1045.  Similarly, ASG and Natura rely on the same sales efforts, have mutual ownership, and have common customers. Given the intermingling of assets, business efforts, management and ownership between ASG and Natura, there is good reason to find that the two are alter egos.

Furthermore, as already discussed in Lynx's recent motion for partial summary judgment against the individual defendants, ASG claims it is in financial difficulty.  ASG is not paying its counsel fees to Kleinbard, Bell & Brecker, LLP ("KBB".)  *See* KBB's motion for leave to withdraw as counsel (docket no. 68).  KBB also wrote a letter on defendants's behalf, dated January 7, 2004, referring to ASG's "current distressed financial condition." The purpose of piercing the corporate veil is to prevent injustice where a corporation is stripped of its assets, rendering it unable to pay its debts and liabilities. *See, e.g., Karo Marketing Corp. v. Playdrome America*, 52 A.2d 341(N.J. Super. 2000)*,* where the court pierced the corporate veil of a

10

management company to reach its parent, subsidiaries, and shareholders to hold them responsible for the management company's breach of contract.  Amar Grewal owns all of ASG's shares and has shown himself willing to siphon funds from ASG.  Now Mr. Grewal has Natura to act as his business vehicle he is stripping ASG of its assets and transferring them to Natura. Unless Natura is held to be ASG's alter ego, Amar Grewal simply can transfer the rest of ASG's assets to Natura to avoid ASG's debts and liabilities and continue to do business as before through Natura.

### B.    <u>Natura is a "mere continuation" of ASG</u>

Although in form a corporation may be separate from another to which it is closely related, the law sometimes will find the first corporation to be a "mere continuation" of the other and find that it has successor liability for the other's debts.  The key factors in determining liability as a continuation of the earlier business are that there is a continuity of management, personnel, location, assets and general business operations.  In *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265 (D.N.J. 1994), the assignor of a lease sued the corporation that had purchased the assignee corporation's assets in foreclosure.  The court found a "de facto" merger and/or continuation of the assignee corporation's business through the purchaser, and found it liable for the assignee's debts.  The court explained that there was a "continuity of management, personnel, physical location, assets, and general business operations" between the assignee corporation and its purchaser, *id.* at 276, and that there was also a "continuity of ownership/shareholders." *Id.*  Therefore, the court found that the purchaser was the continuation of the assignee corporation.  Similarly, both Natura and ASG have the same management and personnel.  Amar Grewal works for both.  Moreover, Kal Grewal pays the bills for both, *see*, *e.g,*

Exhibits 9 through 12 and 14 through 22, invoices, checks, et al., which show Kal Grewal

signing checks to pay both companies' bills. Both corporations are located at 36 Hett Creek

Drive, Port Moody, British Columbia, Canada. Both make and distribute very similar products.

Both are invoiced by the same suppliers, often on the same invoice, and those suppliers are paid

out of one account no matter which company is being charged. *See* Exhibits 9 through 22,

invoices, checks, et al. Furthermore, there is a continuity of ownership in that Amar Grewal

owns all of ASG and is one of only two shareholders in Natura Products, Inc.

 As the *Glynwed* court explained, the factors to consider in determining whether a second

corporation is the continuation of the first include

> (i) continuity of management, personnel, physical location, assets, and general
> business operations; (ii) a cessation of ordinary business and dissolution of the
> predecessor as soon as practically and legally possible; (iii) assumption by the
> successor of the liabilities ordinarily necessary for the uninterrupted continuation
> of the business of the predecessor; and (iv) continuity of ownership/shareholders.

869 F.Supp. at 275-276. However, "[n]ot all of these factors need be present for a de facto

merger or continuation to have occurred." *Id.* at 276, quoting *Luxliner P.L. Export v. RDI

Luxliner,* 13 F.3d 69, 73 (3d Cir.1993) and *Good v. Lackawanna Leather Co.,* 96 N.J.Super. 439,

452, 233 A.2d 201 (1967). For example, in *Woodrick v. Burke Real Estate*, 306 N.J.Super. 61,

703 A.2d 306 (1997), the Superior Court of New Jersey affirmed judgment against a corporation

that purchased the assets of another corporation which had a default judgment entered against it,

relying on the theory that the purchaser was the "continuation" of the judgment debtor. The

critical factors in the court's judgment were that the principal officer of the judgment debtor

assumed management of the portion of the purchaser that used the debtor's assets, while many of

the debtor's employees became employees of the purchaser.  Furthermore, after the purchase, the

debtor existed only as a shell, with no assets.  *Id.*, 703 A.2d at 312.  In the case of ASG, its

counsel has represented that its financial condition is precarious.  It is not paying its legal fees,

and it has yet to produce any documents concerning its sales or financial condition over the last

year.  It is quite likely that ASG has no assets, while the company with which it shares a facility

and common ownership and management, Natura Products, Inc., seems to be where all the

business efforts are being placed.

### C.    ASG made fraudulent transfers to Natura

ASG's transfers to Natura of funds of close to two hundred thousand dollars are

fraudulent as to Lynx.  Under New Jersey's version of the Uniform Fraudulent Transfer Act

("UFTA"), N.J.S.A. §25:2-20 through 25:2-29, the Court has this power in order to prevent ASG

from placing its assets beyond the reach of its creditors (including Lynx).  *See*, *e.g., Gilchinsky v.*

*National Westminster Bank*, 159 N.J. 463, 732 A.2d 482 (1999).  Lynx does not need to have

first obtained judgment in its favor to assert a cause of action for fraudulent conveyance.  An

UFTA cause of action may be asserted even before the defendant is a "debtor."  *Intili v.*

*DiGiorgio*, 300 N.J.Super. 652, 693 A.2d 573 (Ch.1997).

The transfer from ASG to Natura may well be fraudulent as to Lynx in several different

ways.  First, under section 25:2-25,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the transfer was made or the
> obligation was incurred, if the debtor made the transfer or incurred the obligation:
> > a. With actual intent to hinder, delay, or defraud any creditor of the
> > debtor;  or

      b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

          (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;  or

          (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

N.J.S.A. §25:2-25.  ASG began to transfer funds to Natura after it terminated Lynx without paying Lynx the commissions Lynx is owed.  Indeed, ASG transferred nearly two hundred thousand dollars to Natura after Lynx brought this action.  Therefore, there is good reason to suspect that part of the actual intent of the transfer to Natura was to hinder Lynx's efforts to collect what ASG owes.  ASG may well have transferred funds to Natura so that Amar Grewal could use the new company as his income producing vehicle that would allow him to stay in the repellant business while avoiding the liabilities of his old company.  Therefore, the transfer may have been fraudulent under subsection (a).  *See* N.J.S.A. §25-2-26 (factors to determine actual intent include whether transfer was to an insider, made at a time when the debtor had been sued or threatened with suit or at a time when a substantial debt had been incurred).  Moreover, ASG's transfer may have been fraudulent under subsection (b) because it transferred these funds without a reasonable exchange of value at a time that ASG was (or claims to be) in financial difficulty.

     ASG terminated Lynx in 2001, and when it did so it owed ASG substantial unpaid commissions.  Thereafter, ASG became obligated to pay Lynx commissions (at half the contract rate) for the following three years on all sales into Lynx's former territory.  As of August 2001,

Lynx was a present creditor of ASG's to which ASG owed a substantial sum of money. Moreover, in May 2002 Lynx filed suit against ASG to press its claim for that money. Against that background, what ASG did was, early in 2002, transfer a little over $11,000.00 to Natura, *see* Exhibits 5 and 8, and then, after Lynx filed suit against and served ASG, ASG began to pay Natura's bills. *See* Exhibits 9 through 22, invoices, checks, et al. Well after suit was filed, ASG transferred $153,854.75 to Natura. Now, ASG claims to be unable to pay its bills, including attorneys fees. Therefore, the transfers to Natura may also be considered fraudulent under N.J.S.A. §25:2-27, which states:

> 25:2-27. Transfers fraudulent as to present creditors
>
> a. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> b. A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

ASG has been transferring funds to Natura since shortly after it incurred a substantial obligation to Lynx, and this transfer, according to ASG's own protestations, was made at a time when it was insolvent, that is, not paying its debts, such as the debt owed to its attorneys for fees. *See* N.J.S.A. §25:2-23(b) (" A debtor who is generally not paying his debts as they become due is presumed to be insolvent.). Therefore, ASG's transfers to Natura are fraudulent as to Lynx.

The Court can order that no more such fraudulent transfers from ASG to Natura be made, can avoid those that already have taken place, and may attach the assets wrongly transferred.

15

*See* N.J.S.A. §25:2-29.  Therefore, the Court should allow the Complaint to be amended to seek that relief.

## **CONCLUSION**

ASG and Natura are so closely intermingled that Natura must be seen either as ASG's alter ego or a continuation of ASG, and all transfers from ASG to Natura as fraudulent conveyances.  Unless Lynx is allowed to amend its Complaint, there is a real chance that substantial justice will be denied.  Therefore, plaintiff, Lynx Associates, Inc., respectfully moves this Court to grant it leave to amend its Complaint.

Respectfully submitted,

KRAMER & KRAMER, LLP

Dated: _____        BY: _____

                                          Mitchell A. Kramer
                                          1077 Rydal Road, Suite 100
                                          Rydal, PA   19046
                                          (215) 887-9030

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the foregoing Motion For Leave To File A Second Amended Complaint to be served on counsel for defendants via Fedex Overnight Delivery, as follows:

> Robert B. Bodzin, Esquire
> Eric J.Schreiner, Esquire
> Kleinbard, Bell & Becker LLP
> 1900 Market Street, Suite 700
> Philadelphia, Pennsylvania 19103
> Facsimile: (215) 568-0140

Date:  February 9, 2004                                    _____

                                                           Mitchell A. Kramer
                                                           Attorney for Plaintiff

17

## APPENDIX

**Exhibit 1.**  August 1, 1998 Sales Agency Agreement between Lynx and ASG.

**Exhibit 2.**  Portions of the deposition of Amar Grewal.

**Exhibit 3.**  A printout of the pages of Natura Products' website,

"http://www.naturaproducts.ca."

**Exhibit 4.**  Declaration of Michael Kozak.

**Exhibit 5.**  ASG's Statement of Income and Deficit for the year ended January 31, 2002.

**Exhibit 6.**  ASG's corporate tax return for the year ended January 31, 2002.

**Exhibit 7.**  ASG's Statement of Income and Deficit for the year ended January 31, 2003.

**Exhibit 8.**  ASG's "Account QuickReport" as of January 31, 2003.

**Exhibit 9.**  April 18, 2002, Mice & Men Digital Productions Inc. invoice to Natura for $4000.00;

and ASG's check to pay that bill.

**Exhibit 10.**  Five invoices from Mice & Men Digital Productions Inc. to Natura for advertising

products five times dated between May 27, 2002 and July 5, 2002, and ASG's

check to pay all five invoices.

**Exhibit 11.**  An undated registration form, for "Arett Sales' Open House 2002", a "new products

and packaging exhibit."  This form registers "ASG Consultants, Ltd." as the vendor,

but it registers "Natura Gel-E-Beans" as the product to be displayed.  ASG's check

to pay the bill is included in this exhibit.

**Exhibit 12.**  An invoice dated June 14, 2002 from Orca Sign to ASG for signs used at a trade

18

show.  ASG paid the full amount of $3,664.00.  A handwritten note on the invoice

assigns $1,200.00 of this to Natura.

**Exhibit 13.**   A joint registration form dated July 9, 2002, to exhibit at a trade show that Natura

and ASG (d/b/a Repellex) filled out jointly.

**Exhibit 14.**   An invoice dated July 17, 2002, from Transgroup to ASG biling$824.58 for castor

oil.  On the invoice there is a handwritten note saying "Natura 527.73."  ASG then

paid the full invoice by check in December, included in the exhibit.

**Exhibit 15.**   An invoice dated July 29, 2002, from Associated Labels to ASG for many

thousands                  of product labels it had printed.  Some of the labels were for Repellex

products, and                  some were for "Natura Ant-A-Pak" and "Natura Bug-A-Tak."  ASG

paid the bill                  by check included in the exhibit.

**Exhibit 16.**   An invoice dated August 26, 2002, from Associated Labels to ASG for many

thousands of product labels it had printed.  Some of the labels were for Repellex

products, and some were for "Natura Bug-A-Tak."  ASG paid the bill by check

included in the exhibit..

**Exhibit 17.**   An invoice dated October 10, 2002, from Associated Labels to ASG for many

thousands of product labels it had printed.  Some of the labels were for Repellex

products, and some were for "Natura Ant-A-Pak" and "Natura Bug-A-Tak."  ASG

paid the bill by check included in the exhibit.

**Exhibit 18.**   An invoice dated October 15, 2002, from Orca Signs to ASG for "1 set digital

output Gel-a-bean."  "Gel-E-Beans" are a Natura product.  A handwritten note on

19

the invoice assigns the entire invoice to Natura, but it is paid with an ASG check. ASG paid the bill by check included in the exhibit.

**Exhibit 19.** An invoice dated October 26, 2002, from AJP Communications to ASG for display stands for both Repellex products and Natura Buk-A-Tak display stands Gel-E-Bean "images." ASG paid the bill by check included in the exhibit.

**Exhibit 20.** An invoice dated November 16, 2002, from AJP Communicationsto ASG for R Repellex stand revisions and Natura Bug-A-Tak stand revisions and a Natura Weed-A-Tak stand. Also on November 16, 2002, AJP Communications invoiced ASG for a "Repellex Root Saver" labels and labels and cards for Natura Weed-A-Tak and Natura Gel-E-Beans, which is included in this exhibit. ASG paid the two invoices with one check on January 30, 2003, also part of this exhibit.

**Exhibit 21.** Two invoices, one sent to ASG for "Sets and Film" for "Fruit & Vegetable Mosquito & Tick" (ASG products), and the other sent to Natura Products for "Set Film Bug-A-Tak" (Natura products) for $2,386.10. ASG paid both invoices by check on November 19, 2002, which is included in the exhibit.

**Exhibit 22.** An invoice dated January 9, 2003, from AJP Communications to ASG for a "pop stand" for Ant-A-Tak, a Natura product. ASG paid the bill by check included in the exhibit.

**Exhibit 23.** A letter dated January 7, 2004 from defendants' counsel to plaintiff's counsel.